## NORTHERN PAC. RY. CO. v. DIXON.

(Circuit Court of Appeals, Eighth Circuit.  August 4, 1905.)

No. 1,775.

1. MASTER AND SERVANT—TELEGRAPH OPERATOR FELLOW SERVANT OF MEM-BERS OF TRAIN CREW.

A local telegraph operator, whose duty it is to gather and give information to the train dispatcher relative to the arrival of a train at his station, to enable the dispatcher to formulate orders for the movement of other trains, is a fellow servant of the train operatives in giving such information, so that the master is not liable to them for injuries caused by an erroneous order of the dispatcher, induced by false information given by the local operator.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 495, 498.

Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

2. SAME—NEGLIGENCE—RES IPSA LOQUITUR INAPPLICABLE.

The doctrine, "Res ipsa loquitur," is inapplicable to negligence cases arising between master and servant, because the possible causes of accidents during service are many, for some of which the master, and for others of which the servant, is responsible, and the happening of an accident does not indicate to which class its cause belongs.  The burden in such cases is always on him who alleges that the master was guilty of causal negligence to establish that fact.  A finding that an accident happened and that the servant injured was not at fault does not sustain this burden, because the accident may have been unavoidable, or may have resulted from the negligence of fellow servants or from other causes for which the master is not liable.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 879–893.]

3. SAME—MEETING ORDERS—RULES OF COMPANY CONSTRUED.

The rules of a railroad company, that meeting orders must not be sent for delivery to trains of superior right at the points of execution if this can be avoided, and that there should be, if possible, at least one telegraph office between those at which opposing trains meet, do not constitute a peremptory prohibition and command, but except cases in which an ordinarily prudent man would deem it reasonably safe, in the light of the knowledge which the dispatcher has, to send a meeting order for delivery to a train of superior right at the point of execution, or to send meeting orders to opposing trains at points between which there is no telegraph station, and there is no other practical way to reasonably operate the railroad.

4. SAME—TRAIN DISPATCHER MAY RELY ON LOCAL OPERATOR'S STATEMENT THAT TRAIN IS LATE.

The movement of freight trains by telegraphic orders, based on information relative to the location of the trains upon a railroad gathered and telegraphed by local operators or station agents to the train dispatcher, is a rational, careful, and approved method of operating a railroad.  It is not a lack of ordinary care for a train dispatcher to believe, rely, and act upon such information, although it shows that an extra freight train has not reached a given station several hours after it was due to pass it.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

The defendant in error, as administratrix of the estate of Chauncey A. Dixon, brought this action against the Northern Pacific Railway Company, as she was authorized to do by the statutes of the state of Montana, to re-

cover damages for the death of her son, Chauncey, which she alleged was caused by the negligence of the plaintiff in error. The parties waived a jury and made an agreed statement of facts, upon which the court rendered the judgment against the company which is here challenged. The facts material to the determination of the questions now presented are these: Dixon was a fireman employed by the company in operating extra freight train No. 162, and he was killed on December 25, 1899, by means of a head-end collision of that train with extra freight train No. 159. The railway company was operating its railroad in Montana. It had made and promulgated time-tables for its regular trains, and had adopted reasonable rules for the operation of all its trains. The time-tables did not and could not provide for the running of extra trains. The railway company had in its employment a train dispatcher at Missoula, in the state of Montana, who had general power and sole authority to make and promulgate orders for the running of those trains which were not governed by the time-tables on the division of its railroad on which this collision occurred. A large proportion of its trains on this division were run as extra trains, and the times of their arrival and departure were not shown on the regular time-tables, but their movements were made upon telegraphic orders issued by the train dispatcher upon information furnished by telegraph to the train dispatcher by its station agents and operators along the line of the railroad. All these facts were well known to the intestate, Chauncey A. Dixon. The main line of the railroad extends from Missoula east to Helena, through Bonita, 26 miles east of Missouri, Carlan, 33 miles east of Missoula, Drummond, 53 miles east of Missoula, and Garrison, 74 miles east of Missoula. It has but a single track. This railroad has a branch, which extends in a southeasterly direction from Garrison to Butte. On the night of December 24, 1899, No. 162 was running east on the main line from Missoula to Helena, and No. 159 was running northwest on the branch line from Butte to Garrison. These trains were running under special schedules not included in the time-tables, and under the telegraphic orders of the train dispatcher at Missoula, in accordance with the rules of the company. No. 162 left Missoula for Helena at 10:20 p. m. on December 24, 1899. It arrived at Bonita at 12:35 a. m. on December 25, 1899, and left there at 12:50 a. m. on that day. It was the duty of the telegraph operator and station agent at Bonita to observe the movement of trains passing through this station, and to advise the train dispatcher at Missoula of their movements. But he was asleep when this train passed his station, and he did not know of or report its passage. The only telegraph offices open during the night between Missoula and Garrison were those at Bonita and Drummond. When No. 162 left Missoula, and when it left Bonita, No. 159 was still on the branch line between Butte and Garrison, where it arrived at 1:05 a. m., and "until said train No. 159 reached Garrison it had not been nor could it be determined whether said train No. 159 would run beyond Garrison or would stop at that point." The rules of the company provide, among other things, that "meeting order or orders, conferring rights to the point where placed, must not be sent for delivery to the trains of superior right at the point of execution, if it can be avoided. When it cannot be avoided, special precaution must be taken by the train dispatcher and operators to insure safety, and the following notice will be incorporated in the order, viz.: Train ——— gets this order at ———. There should be, if possible, at least one telegraph office between those at which opposing trains receive meeting orders." Upon the arrival of No. 159 at Garrison, at 1:05 a. m. on December 25, 1899, the train dispatcher asked the telegraph operator and station agent at Bonita by telegram whether or not train No. 162 had arrived there, and he promptly answered that it had not. The train dispatcher then ordered the train crew of No. 159 to run extra from Garrison to Missoula, and to meet No. 162 at Carlan, and this order was received by that crew at Garrison. At the same time he ordered the crew of No. 162 to meet No. 159 at Carlan, and sent this order to the operator and station agent at Bonita to deliver to them. He ordered a red signal displayed at Drummond to stop No. 159, so that the meeting point could be changed on its arrival at that station if necessary. These orders were complete at 1:18 a. m. At 1:20 a. m. No. 159 left Garrison, and it arrived at Drummond at 1:57 a. m., and the train dispatcher was immediately in-

formed of this fact. He then inquired of the operator and station agent at Bonita whether or not extra freight No. 162 had arrived at Bonita yet, and the latter promptly replied, "No sign of them yet." He then asked him if he was sure No. 162 had not passed, and he replied, "Yes." The train dispatcher then repeated his inquiry, and the operator and station agent at Bonita answered, "Yes, I am sure freight 162 has not passed." Thereupon the train dispatcher issued an order to the crew of No. 159 to meet No. 162 at Bonita, and an order to the crew of No. 162 to meet No. 159 at Bonita, and sent the former order to Drummond and the latter to Bonita. The crew of No. 159 received their order and proceeded with their train. It collided with No. 162, and the intestate, Dixon, was killed by the collision, about four miles west of Drummond, at 2:15 a. m.

James B. Kerr (Emerson Hadley and C. W. Bunn, on the brief), for plaintiff in error.

A. M. Antrobus (D. J. O'Connell and R. J. Burglehaus, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and ADAMS, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

At the first hearing of this case the negligence of the local operator at Bonita, who slept at his post and falsely informed the train dispatcher that extra freight No. 162 had not passed his station, was conceded to have been the cause of the collision and of the death of the intestate, and the only question argued was whether or not this operator was a fellow servant of the deceased, who was a fireman on that train. The Supreme Court decided that he was (Northern Pacific Ry. Co. v. Dixon, 194 U. S. 338, 24 Sup. Ct. 683, 48 L. Ed. 1006), and thus disposed of the only issue that was then presented in this court. Since that decision was rendered counsel for the defendant in error has prepared another brief and argument, in which he contends that, although the negligence of the local operator may have been one of the causes of the accident, the negligence of the train dispatcher was either the proximate cause of or contributed to cause it. This contention presents two questions: (1) Was the train dispatcher guilty of negligence which either caused or contributed to cause the injury? and (2) was the train dispatcher the fellow servant of the fireman, or the vice principal of the railway company? The contention that the lack of care of the train dispatcher contributed to cause the injury is (1) that the accident itself and the finding of the court below that the fireman was not guilty of contributory negligence raise the legal presumption that the accident was caused by the negligence of the railway company; (2) that the failure of the train dispatcher to notify the crew of extra freight No. 162 that they would meet extra freight No. 159 was causal negligence; and (3) that the sending of the final order to the crew of No. 162 at Bonita to meet No. 159 at that place was a violation of the rules of the railway company and a negligent act of the train dispatcher which contributed to the injury.

But the doctrine, "res ipsa loquitur," is inapplicable to cases between master and servant brought to recover damages for negligence, because there are many possible causes of accidents during service, the risk of some of which, such as the negligence of fellow servants and the other ordinary dangers of the work, the servant assumes, while for the risk of others, such as the lack of ordinary care to construct or keep in repair the machinery or place of work, the master is responsible. The mere happening of an accident which injures a servant fails to indicate whether it resulted from one of the causes the risk of which is the servant's, or from one of those the risk of which is the master's; and for this reason it raises no presumption that it was caused by the negligence of the latter. In such cases the burden of proof is always upon him who avers that the negligence of the master caused the accident to establish that fact, and a naked finding, as in this case, that the accident occurred and that the servant was guilty of no negligence which contributed to cause his injury, is insufficient to sustain this burden, for there are many other causes than the negligence of the master and that of the servant, such as the negligence of fellow servants and latent and undiscoverable defects in place or machinery, which may have produced it. Chicago & N. W. Ry. Co. v. O'Brien, 132 Fed. 593, 596, 598, 67 C. C. A. 421; Westland v. Gold Coin Mines Co., 41 C. C. A. 199, 200, 101 Fed. 65; Texas & Pac. Ry. Co. v. Barrett, 166 U. S. 617, 17 Sup. Ct. 707, 41 L. Ed. 1136; Patton v. Texas & Pac. Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; O'Connor v. Ry. Co., 83 Iowa, 105, 48 N. W. 1002; Brownfield v. Ry. Co., 107 Iowa, 254, 77 N. W. 1038; Brymer v. Ry. Co., 90 Cal. 497, 27 Pac. 371; Huff v. Austin, 46 Ohio St. 386, 21 N. E. 864, 15 Am. St. Rep. 613; Wormell v. Railroad Co., 79 Me. 397, 10 Atl. 49, 1 Am. St. Rep. 321; Grant v. Railroad Co., 133 N. Y. 659, 31 N. E. 220. The happening of the accident and the absence of contributory negligence of the servant constitute no substantial evidence of the causal negligence of the master, and are insufficient to support a finding or judgment against him for the injury which resulted from it.

In Northern Pac. Ry. Co. v. Mix, 121 Fed. 476, 57 C. C. A. 592, the Circuit Court of Appeals of the Ninth Circuit sustained a judgment against the plaintiff in error in this case for injuries to the head brakeman of extra freight No. 162, caused by the collision under consideration here, upon the ground that the train dispatcher was guilty of negligence because he did not notify or endeavor to notify the crew of that train at or before it passed Bonita that they were to meet freight train No. 159 on their way to Helena, and that case is cited and urged upon our consideration to secure a like conclusion in this case. In the case in hand, however, the parties have agreed that prior to 1:05 a. m. of December 25, 1899, No. 159 was not running upon the main line between Missoula and Helena, which No. 162 was to traverse, but was upon a branch railroad between Butte and Garrison; that No. 162 left Bonita going east at 12:50 a. m., 15 minutes before No. 159 arrived at Garrison; that "until said train No. 159 reached Garrison it had not been nor could

it be determined whether said train No. 159 would run beyond Garrison or would stop at that point," a fact which does not appear in the report of, and which doubtless was not proved in, the Mix Case; and that there was no telegraph station open on the night of the accident between Bonita and the place of the collision. The absence from the Mix Case of the controlling fact which appears in this case, that the train dispatcher did not know and could not learn whether or not No. 159 would ever come upon the main line of railroad over which No. 162 was to run until after the latter train had left Bonita, distinguishes that case from the one we have in hand and renders farther consideration of it useless. Inasmuch as, prior to the departure of No. 162 from Bonita on its way east, No. 159 was not upon the line of railroad which No. 162 was to traverse, and it was not known and could not be determined before 1:05 a. m., when it arrived at Garrison, whether or not it would ever go upon that line of railroad, the train dispatcher was guilty of no negligence in that he failed to notify, or try to notify, the crew of No. 162, before they left Bonita, that they would meet No. 159, a fact which he did not know and could not know until 15 minutes after they had left that station.

Counsel for the defendant in error insists that the train dispatcher failed to exercise ordinary care, because he sent his last meeting order for delivery to No. 162, a train of superior right, at Bonita, the point of execution, in violation of the rules that such orders must not be sent for delivery to the points of execution if that course can be avoided, and that there should be, if possible, at least one telegraph office between those at which opposing trains receive meeting orders. There are two reasons why this position seems to be untenable. In the first place, these rules do not imperatively require a telegraph office between those at which opposing trains receive meeting orders, nor peremptorily forbid the delivery of a meeting order to a train of superior right at the point of execution. The requirement is conditioned by the words "if possible," and the prohibition by the phrase "if it can be avoided," and the true interpretation of these rules is that the command and inhibition are to be obeyed, if this may be done consistently with a rational and practical operation of the railroad. They do not mean that the train dispatcher must stop the operation of the railroad, or that trains must be sent back toward their starting points, until meeting orders can be delivered to trains of superior right at points other than those of their execution and a telegraph office can be interposed between the stations at which opposing trains receive their meeting orders, when an ordinarily careful and prudent man would deem it reasonably safe, in the light of the knowledge which the dispatcher has, to send a meeting order for delivery to a train of superior right at the point of execution, or to deliver such orders to opposing trains when there is no telegraph office between them, and there is no other practical and rational manner of keeping the railroad in operation. In the case at bar the first meeting order issued was not sent for delivery to the train of superior right at the point

of execution, and there was a telegraph office between those at which the opposing trains were to receive their first orders. In those orders the meeting place was Carlan. The order was sent for delivery to No. 162 at Bonita and to No. 159 at Garrison, and the telegraph office at Drummond was between them. The order was not delivered to the crew of No. 162, because the false statement of the operator that it had not passed Bonita misled the dispatcher. No. 159, however, received its order and advanced to Drummond. There was then no telegraph office between Drummond and Bonita, and it was not possible to interpose one between the places where the opposing trains must receive subsequent orders, or to send a meeting order for delivery to No. 162 at a place other than the point of execution, without sending one or both of the trains back, or holding No. 159 at Drummond until No. 162, which appeared to the dispatcher to have been delayed west of Bonita, should reach Drummond. The adoption of such a course would not have been the adoption of ordinary, but of extraordinary, care, and this the law did not require. When No. 159 arrived at Drummond, the dispatcher asked the operator at Bonita a second time if No. 162 had arrived there, and he replied, "No sign of them yet." He asked if he was sure that No. 162 had not passed, and he answered, "Yes." He repeated the inquiry, and the operator replied, "Yes, I am sure freight 162 has not passed." Then it was that the dispatcher ordered the trains to meet at Bonita, and sent the order for the crew of No. 162 to that place for delivery, and the order for the crew of No. 159 to Drummond. The railway company did not become liable for injuries caused by the collision, and the train dispatcher displayed no lack of ordinary care and violated no rule of the company by this action, because it was not then possible, within the true meaning of the rules, to have a telegraph office between those at which these trains were to receive their meeting orders, and the sending of the meeting order to the train of superior right at the point of execution could not be avoided.

In the second place, if the last meeting orders were in violation of the rules of the company, they did not contribute to cause the accident, and consequently they were not actionable. The collision would, in all probability, have happened if no change had been made in the place of meeting. In that event No. 159 would have proceeded from Drummond toward Carlan, the appointed place for the trains to meet, and before it had arrived at that place it would inevitably have met and collided with No. 162, exactly as it did under the orders which changed the place of meeting. The judgment against the company cannot be sustained on account of the last meeting orders, because the dispatcher violated no rule of the company and was guilty of no negligence in issuing them, and because they contributed in no way to cause the collision.

When the final orders were made, 3 hours and 37 minutes had elapsed after No. 162 had left Missoula, and a reasonable time for it to reach Bonita was not more than 1 hour and 30 minutes. Counsel argues that the dispatcher was negligent, because he did not assume that

the repeated statement of the operator at Bonita that this train had not passed that station was false, and because he did not operate the railroad on that theory, or stop its operation until he could send a messenger over the road, or could in some other way ascertain what the fact was. But this contention is unworthy of serious consideration. The delay of a freight train a few hours beyond its regular time is not so extraordinary an occurrence that a man of ordinary caution would be led to believe or to suspect the falsity of the statement of a local operator on the railroad, whose duty it is to know the fact and to communicate it, that it had not reached or passed his station. Many adequate possible causes of such delays at once suggest themselves to the mind, such as pulled drawbars, hot boxes, broken rails, other possible defects of the road and machinery, and the negligence and mistakes of the trainmen. If the statement of the operator had been true, and the dispatcher had sent another train from Missoula to Bonita on the theory that it was false, and it had crashed into No. 162 and injured its crew, his negligence would have been patent. The truth is that the movement of extra freight trains by telegraphic orders, based upon the information of the location of the trains upon the railroad gathered and communicated by local telegraph operators is a rational, careful, and approved method of the operation of railroads. This railroad had been and was operated in this way, and the fireman, Dixon, knew it. The risk of this method of the movement of trains was one of the ordinary hazards of his service, which he assumed when he accepted his employment, and as long as the train dispatcher directed the movement of the trains by that method with ordinary care he could not be successfully charged with actionable negligence, while if he had disregarded the information furnished by the local operators, and had operated the railroad upon his own surmise or estimate of the respective locations of the trains upon it, his lack of ordinary care would have been clear and undeniable. The fact is that it is clear beyond all reasonable doubt that the proximate cause of this accident was the negligence of the local operator, who slept at his post and falsely informed the dispatcher that No. 162 had not passed his station. That untrue statement was the sole cause of the meeting orders issued by the dispatcher, and of the accident which resulted from them. In the light of that statement, upon which it was his right and his duty to rely and to act, the acts of the train dispatcher were rational, prudent, and free from any lack of ordinary care, and no judgment against the company can be sustained on account of them.

The conclusion that the train dispatcher was guilty of no negligence renders it unnecessary to consider or to determine the question whether or not he was a fellow servant of the fireman, and that issue is reserved for consideration at some future time, when its determination shall become necessary to the decision of some living issue. The judgment of the Circuit Court must be reversed, and the case must be remanded, with instructions to render a judgment upon the agreed statement of facts in favor of the defendant in the court below; and it is so ordered.