## MINNEAPOLIS GENERAL ELECTRIC CO. v. CRONON.

### (Circuit Court of Appeals, Eighth Circuit. December 14, 1908.)

#### No. 2,659.

1. ELECTRICITY (§ 15*)—DEATH FROM CONTACT WITH LIVE ELECTRIC WIRE.

Where the inside wiring for lighting by electricity of a private house, such as a shop, is done under an independent contract with the owner of the building, and is accepted by him and approved by the city inspector as sufficient, such inside wires become the private property of the proprietor of the building, and are subject to his exclusive control. A third party voluntarily and uninvited entering such shop to ascertain the cause of and to extinguish a fire therein is a mere licensee, to whom the company furnishing the electric current to the house owes no obligation other than not to wantonly or knowingly injure him. And where such inside wiring becomes imperfectly insulated by the act of the owner of the building, without notice thereof to the electric company, resulting in injury to such licensee, *held* not to give a cause of action for such injury against the company in favor of the legal representative of the deceased licensee.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 15.*]

2. TRIAL (§ 244*)—ERROR IN CHARGE TO THE JURY.

It devolves upon the plaintiff in an action for damages based upon the negligence of the defendant not only to present in his petition a definite theory upon which the negligence is predicated, but to support it by tangible evidence as distinguished from mere conjecture and possibility. Where the evidence leaves the matter uncertain as to which one of several things immediately brought about the injury, for some of which the defendant is answerable and for others he is not, it is error for the court to single out a responsible act and suggest to the jury that they may infer it, without directing their attention to other inferences, more or equally reasonable, exculpatory of the defendant.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 244.*]

3. ELECTRICITY (§ 19*)—INJURIES—ACTIONS—DOCTRINE OF RES IPSA LOQUITUR.

The doctrine of res ipsa loquitur is at best uncertain, and should not be applied except where it not only supports the conclusion contended for,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

·but also reasonably excludes all others. It is limited to cases of absolute duty, or an obligation practically amounting to that of an insurer. *Held*, that it cannot be invoked to hold liable an electric company furnishing a current of electricity to a private house, connecting with inside wiring owned by and under the exclusive control of the proprietor of the building, for an injury resulting directly from the imperfect insulation and condition of such inside wiring, merely because the electric company is producing and furnishing the dangerous and subtle element of electricity under a contract with the owner of the building.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 19.*]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

Clark Hempstead (M. B. Koon, Ralph Whelan, and William H. Bennett, on the brief), for plaintiff in error.

Arthur H. Noyes (Esli L. Sutton, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The writ of error is to have reviewed the judgment of the Circuit Court in awarding defendant in error $3,500 damages, resulting from the death of her husband, James E. Cronon.

About 6 o'clock a. m. on May 24, 1906, the deceased discovered smoke coming from the blacksmith shop of one Victor Nordloff, on Central avenue, in the city of Minneapolis, Minn. This shop was a small frame building of one room, one story in height, standing about 37 feet from the residence of the deceased. Finding the shop locked, Cronon thrust his hand through a broken pane of glass in the window, and, unfastening the window, entered the shop. He discovered that the wall near the window was afire, against which hung, suspended on a nail, an electric wire. This suspended wire was about 12 feet in length, with an incandescent electric bulb at the end, and was used by the blacksmith in shoeing horses and doing other work at nighttime, or when the day was dark. When not so in use the blacksmith hung this wire on a nail driven into the side wall of the shop. After entering the building through the window the deceased called to his wife to bring a pail of water, which she did and passed to him through said open window. He dashed the water on the fire, but failing to extinguish it called for another vessel of water, which his wife brought and passed to him in the same way, and which he threw on the fire with a like result. He then directed her to bring a larger vessel of water. As she turned to go, she testified, she heard him fall, and looking through the window discovered him lying on his back about three feet from said wall, with the end of the electric wire, broken off, grasped in his right hand, his hand resting on his chest. The man she called to the scene passed in through the window and found Cronon dead. The palm of his hand holding the wire was badly burned, indicating that death thus resulted from the electric current, as

there was no other mark upon his body indicating contact with the wire.

The evidence of the wife was that when she returned to the window the last time, again placing her hands on the sill, she felt perceptibly an electric shock. This was confirmed by the man who entered through the window. His testimony was that he was working in the railroad yards hard by, and as it had been raining during the night he had on a rubber coat, and with him rubber gloves, which gave sufficient insulation to enable him to pass through the window without feeling any electric shock. As no such appearance of electricity was manifested at the window when the deceased passed and when the wife handed the first two buckets of water through the window, it is evident that the presence of sufficient electricity to be felt at the window did not manifest itself until after the suspended wire was separated from the nail on the wall and its broken end was left unprotected.

The inside wiring of the blacksmith shop was done under an independent contract by the plaintiff in error with the owner of the shop some three years prior to the accident in question, and it was inspected by the city authorities when completed, and accepted as sufficient. This inside wiring then became the private property of the owner of the building. The use of the suspended wire was for his own convenience, and the manner of hanging it against the wooden wall on the nail was of his own selection. From long use the insulating covering of this wire became much worn where it rested on said nail. There was no notice given to the electric company of this condition of the wire. When the blacksmith concluded his work the evening preceding the accident, he left the wire suspended on this nail. He closed and locked the shop and went to his home, and had not returned to his work at the time of the accident. The evidence further shows that the deceased frequented said shop, and had at times assisted the blacksmith in his work, and had knowledge of the use and position of said suspended wire.

The actionable negligence imputed by the petition to the company is as follows:

"That on the 24th day of May, A. D. 1906, and for a long time prior thereto, the above-named defendant had maintained said system or set of wires running into said blacksmith shop, a one-story frame building, known as 930 Central avenue, in the city of Minneapolis, Hennepin county, state of Minnesota, as above described, for lighting purposes, and that such wires had, through the carelessness and negligence of the above-named defendant, become old, defective, and dangerous, the insulation having worn off to a large extent. That the insulation and support of said wires had become, through the carelessness and negligence of the defendant, defective and insufficient, so that they had become crossed and in contact with other wires belonging to said defendant company, or to some other company to this plaintiff unknown, in such a way as to become on the day above set forth highly and dangerously charged with a high and dangerous voltage of electricity, so that early on the morning of the day above set forth, and before the above-named blacksmith, Victor Nordloff, had come to his shop known as 930 Central avenue, said blacksmith shop was set on fire by the defective and improperly insulated wires of said defendant company."

A correct analysis of the foregoing specifications enforces the conclusion that the gravamen of the complaint is that the negligence of

the company refers alone to the imperfect condition of the wires inside the building and the resultant injury therefrom. The predicate of the charge is that the company had maintained said system or set of wires running into said blacksmith shop; that such wires, through the carelessness and negligence of the defendant, had become old, defective, and dangerous, the insulation having worn off to a large extent. It further avers "that the insulation and support of said wires had become, through the carelessness and negligence of the defendant, defective and insufficient"; and that by reason of this fact they had become crossed and in contact with other wires of the defendant company or some other company, in such manner as at the time in question to become highly dangerous and charged with a high voltage of electricity. And, to put this construction beyond tolerant debate, it concludes with the statement that "said blacksmith shop was set on fire by the defective and improperly insulated wires of said defendant company." So, throughout the trial, and as indicated by the charge of the court, the company was sought to be held responsible for the condition of the wires inside of the shop, as not being in condition to receive the charge of the current at that time sent into the building. The court refused to admit proof offered by the company that the shop was wired under an independent contract, paid for by the shop owner, and it became his property, and under the agreement was by him to be kept inspected and repaired; the assertion of the court being that it was the responsible duty of the company furnishing the electricity to see to it that the inside wiring of the building was in safe condition for transmission into it of the electricity.

As if the issue tendered by the petition warranted it, the plaintiff below was indulged to introduce a lot of expert testimony for the purpose of showing that the charge of voltage passing over such wire was too great, and that it might be inferred that the company was guilty of some negligence in not seeing that its transmitters, at some undisclosed point on its system of wires, were out of order, without any other fact or circumstance from which such inference might be drawn, or that the cause thereof, occurring at that time of the morning, could have been known to or discovered by the defendant.

It is true the wiring done in this shop, some three years prior to the accident, was under a contract with the company. But there was no pretense, and no foundation for any, that the work as done by the company was improper or imperfect, or that the fire resulted from any such cause. The suspended wire was for the convenience of the blacksmith, to be used in his own way. When not in use, as is frequently and safely done, he could have looped up the suspended wire out of the way, thus leaving it perfectly insulated. Or he could have hung it to one side free from contact with the wall. Instead thereof, or other safe method, he saw fit to hang it on a nail driven into the wall, so that the wire was thus placed in contact with the wall. Not only that, but he hung it over the nail for so long a time that the insulating covering of the wire became so broken and worn as to expose the live wire to the inflammable wooden wall, but for which the fire would not have occurred. This is a demonstrated, indisputable con-

clusion from the fact that there was another suspended insulated wire in the back part of the building and no danger came therefrom. So there is no reasonable escape from the conclusion that the immediate cause of the fire was the exposed condition of the live wire against the wooden wall of the building. That was the direct fault of the blacksmith, over whose action the company had no right of control.

The only answer made to this is that as the company was manufacturing and furnishing for the building a highly dangerous and subtle force, under its immediate control in the transmission, it fell short of its duty to the owner and to the public who might chance to enter the building in not seeing that the inside wires were, at the instant, in such condition of repair and insulation as to prevent the impartation of electricity from the exposed live wire to the building.

The only pertinent case cited in support of this extreme doctrine is that of Maysville Gas Company v. Thomas' Adm'r, 75 S. W. 1129, 25 Ky. Law Rep. 403, and the antecedent case by the same court, cited in the opinion. The gas company furnished electricity to the Maysville Railroad & Transfer Company, a street railroad. The injury resulted from the electric current escaping through the negligence of the railway company. The court held that, on account of the dangerous character of the forces produced by the gas company, the duty was imposed both upon it and the railway company to see that the wires into which the electricity was sent by the gas company were properly insulated; that the danger was the same whether the wires were owned by one or both corporations; that the gas company was compelled to know that the means of its distribution were in such condition that those whose business or pleasure brought them in contact with it might do so with safety; and that both companies were liable. No considerate authority supports this proposition. Its recognition and enforcement by the courts would impose upon the company furnishing electricity under contract with the owner of a building, who had wired it and owned and controlled the wires inside, an intolerable burden. Take such a city as Minneapolis, with perhaps 20,-000 dwelling and business houses wired inside, under an independent contract. The contract of the electrical company is to furnish the required amount of electricity to light these buildings. Can the company, unbidden, enter at will the private house of the citizen and pass into its various rooms to inspect these wires every day to see that they are in proper condition for the reception of the electricity it has contracted to sell? If so, it must employ a large retinue of competent men to do this work; and, as absolute insurers under the rule contended for, the necessities of the situation would demand that they should have free access to these buildings at all hours and under all conditions. Such a rule of law would tend to put concerns furnishing electricity to private houses out of business.

This question was passed upon by the Court of Appeals of Colorado, in National Fire Insurance Company v. Denver Consolidated Electric Company, 16 Colo. App. 86, 63 Pac. 949. The insurance company undertook to hold the electric company responsible for the destruction of a part of the railroad station in Denver, on the theory that the fire was imparted to the building from the electric wires therein,

attributable, as the insurance company claimed, to the negligent and imperfect construction of this wiring. Although the electric company did not do this work, it was sought to hold it responsible on the ground (1) that it had notice of the dangerous condition of the wires, which the evidence failed to sustain; and (2) that, under its contract to furnish so subtle and dangerous an element for lighting the building, it was its duty to have seen to it that the inside wires were at all times in a safe condition. That eminent jurist, Bissell, P. J., rejected this contention, and said, in effect, that to charge the electric company with responsibility for the imperfect and uninsulated condition of the wires in the building, of which it had no notice, would impose a burden beyond its contract and undertaking. He further said:

"We do not assent to the position that the electric light company had no business to deliver the current without informing the depot company of the danger attending its use, and particularly of the danger attending its use where the wiring was defective or its construction unskillful and negligent. Where parties undertake to wire their own property, and then apply to a light company to deliver a current to light the building, they must be assumed to take all risks resulting from the character of the wire which is put in the building and the method of construction which is adopted in putting it in. We do not believe that the principle contained in some cases to which our attention has been called * * * is at all applicable. * * * It is a matter of common knowledge, and in fact of universal knowledge, that an electric current is dangerous, and must be discreetly and prudently handled in order to avoid danger either to life or to property. We are quite ready to concede that, when an electric light company undertakes to supply a dangerous current to a dwelling house or to a building, they are bound to see that the wires they put in and the connections they make are properly insulated and protected, so that no harm will come to the property. Where, however, they are only employed to deliver the current by connection with wiring already made by the individual who owns the property, it seems to us that their responsibility ends when the connection is properly made under proper conditions, and they deliver the current in a manner which will protect both life and property. We do not believe any such responsibility rests on the company as to require them to advise the persons who apply for the connection that they must see to it that the wiring is of a certain class or description, that it is insulated in a particular manner, and that there is no connection between it and the woodwork, and failing in this, that they will be liable for any damages which may happen because of the negligent or unskillful nature of the construction. When parties wire houses they are supposed to have done it intelligently and to have hired competent persons for the purpose, to whom alone they must look in case the work is improperly and unskillfully done."

The only difference between that case and this is that here there is no charge that the wiring in this shop was imperfectly or badly done, or that the injury resulted from original bad construction. But the injury is alleged to have resulted from the wires in the building being suffered to become worn and out of order, whereby the current or voltage sent into them escaped and did the injury.

In Memphis Consolidated Gas & Electric Company v. Speers, 113 Tenn. 83, 81 S. W. 595, Speers sued the company for the value of a horse, killed by electricity communicated from an illuminated sign on a post to which the horse was hitched. In hitching the horse the owner threw a small steel chain around the post, and fastened the two ends of the chain to the bit in the horse's mouth. The chain came in contact with a metal clamp containing the electric wire, improperly insulated, and the electric current was thus conducted to the horse's

mouth and killed him. The wiring about the premises of the owner of the sign was done under his order, and was his property under his exclusive control. It was inspected and accepted by the city, just as in the case of the blacksmith shop in question. The only relation the gas and electric company sustained to this matter was that it furnished the electricity therefor, for which the owner paid. This testimony was excluded by the trial court, just as in the case at bar. The court said that, although electricity is a subtle and dangerous agent unless properly controlled, that fact did not place responsibility on the company when it simply furnished the electric current for the wires of the owner of the illuminated sign and post, and that there was no duty of inspection on the part of the company. By way of illustration the court said that, although the gas used for illuminating purposes, uncontrolled, is also a dangerous agency, it could not be maintained that a company which made and furnished it to the pipes of the customer on his own premises would be liable for his asphyxiation, or one of his guests, or a stranger, caused by a leakage from the pipes. "Or, changing the illustration, should there be so violent an explosion of the gas accumulated from the leak that the house of his neighbor, who has no interest in or control over them, was injured, could it be said the company furnishing the gas was liable to either for his loss?" The court maintained that the liability of the company for such a defect is dependent upon the interest in or control over the appliance in which the defect exists. It then said:

"The Circuit Judge, in excluding the testimony as to the ownership and control of the defective wires by another than the plaintiff in error, as well as in his charge, was controlled by the case of Maysville Gas Co. v. Thomas' Adm'r, 75 S. W. 1129, 25 Ky. Law Rep. 403. While the opinions of that court are entitled to the highest respect, yet we are not able to coincide with its reasoning in that case. The sounder view, we think, is that of the Court of Appeals of Colorado, as expressed in National Fire Ins. Co. v. Denver Consol. Electric Co., 16 Colo. App. 86, 63 Pac. 949."

Then, speaking of the conclusion reached in the Kentucky case, the court said:

"Pressed to its legitimate conclusion, we think this argument would make an electric or a gas company an insurer against defects in appliances over which they had no control, and, to avoid liability, would impose upon them the duty of continued inspection of the wires and pipes of every customer supplied with their products. This would be a burden which no such company could bear and live; and it also would be a source of annoyance to its customers, which they would not long submit to."

The circumstances persuasively indicate that the most rational inference to be drawn by the impartial mind is that the deceased voluntarily undertook to disconnect the wire from the wall with his hand. The wire was on the nail when he entered the building; it was there until after the second bucket of water was thrown on the fire. Immediately after his wife turned to go for the third bucket of water she heard him fall, and looking into the window discovered him lying on his back, grasping the end of the wire in his hand. How did the wire get into his hand? Is not the more reasonable answer: Discovering that the water had not extinguished the blaze, he conceived the idea of detaching the wire from contact with the wood, to end the imparta-

tion of the electric current, so that when the third bucket of water arrived he could the more certainly extinguish the fire? But the court, to parry the force of this inference, gave license to the jury in its charge to enter the wide field of possible conjecture, by suggesting to them that they might consider the fact that the instinct of self-preservation would dictate to a man of common sense not to take such an obvious live wire in his naked hand; and, therefore, the jury were at liberty to assume that he grabbed the wire in his hand as it fell, to protect himself from contact with it. If his body had shown evidence of the wire having struck it first, there might be some reasonable basis for the jury to indulge such presumption. But there was no such evidence. Where he stood and fell was about three feet from where the wire hung on the wall. If it fell from the nail, would it have struck him where he stood? If so, where is the proof? "It is not permissible to guess at the cause of an injury, and assume it is something for which the defendant is responsible." Reese v. Clark, 146 Pa. 465, 23 Atl. 246. The rule, and a sane one, laid down by the Supreme Court, in Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, is that it is not sufficient to show that an accident happened and an injury ensued. The evidence must point out that the negligence of the defendant was the direct cause.

"Where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion." This rule was recognized by this court in Chicago & N. W. Railway Company v. O'Brien, 132 Fed. 593–597, 67 C. C. A. 421, 425.

"When an alleged injury may have been due to one or the other of two causes, either one of which may have been the sole proximate cause, there can be no recovery unless it is shown that as between the two causes in question it was the negligence of the defendant which caused the injuries." Searles v. Manhattan Railway Co., 101 N. Y. *661, 5 N. E. 66; The Nellie Flagg (D. C.) 23 Fed. 671; Hartford Company v. Wise, 75 Md. 38, 23 Atl. 65.

If the deceased took hold of the live wire to disengage it from the wall, it was both a voluntary and reckless act, and the maxim volenti non fit injuria would apply.

A plaintiff is required to develop a theory upon which the actionable negligence of the defendant is claimed, and such theory must be supported by tangible evidence. The jury may not be indulged, against visible facts contradicting it, to guess that it was otherwise. The burden of proof ought not to be shifted after such fashion, to enable the plaintiff to recover. The palpable, undisputed evidence is that when the deceased voluntarily entered the building the wire was in its place on the wall. Shortly thereafter he was found dead grasping the wire in his hand; and the indisputable further fact appears that it was the electrical current through this hand that caused his death. Against this obviously reasonable conclusion it devolved upon the plaintiff to

show that the deceased did not voluntarily so grasp it. It was certainly unequal for the court, in its charge, to throw into the scale the said suggestion to the jury, without also directing their special attention to the counter obvious inference, inculpatory of the action of the deceased.

The doctrine of res ipso loquitur, invoked in argument, has no place under the facts of this case. At best it is uncertain, if not dangerous, in practice, and should not be applied, "except when it not only supports the conclusion contended for, but also reasonably excludes all others." Peirce v. Kile, 80 Fed. 865, 26 C. C. A. 201; Chicago & N. W. Ry. Co. v. O'Brien, 132 Fed. 593, 67 C. C. A. 421; Northern Pacific Ry. Co. v. Dixon, 139 Fed. 737, 71 C. C. A. 555.

The qualification of the doctrine is aptly expressed by the court in East End Oil Company v. Pennsylvania Torpedo Company, 190 Pa. St. 353, 42 Atl. 708, as follows:

"The maxim res ipsa loquitur is itself the expression of an exception to the general rule that negligence is not to be inferred but to be affirmatively proved. The ordinary application of the maxim is limited to cases of an absolute duty, or an obligation practically amounting to that of an insurer. Cases not coming under one or both of these heads must be those in which the circumstances are free from dispute and show, not only that they were under the exclusive control of the defendant, but that in the ordinary course of experience no such result follows as that complained of. It is sometimes said that the mere happening of an accident in this class of cases raises a presumption of negligence, but this is hardly accurate. Negligence is never presumed. If it were, it would be the duty of the court, in the absence of exculpatory evidence by the defendant, to direct a verdict for the plaintiff, whereas in these cases the question is for the jury. The accurate statement of the law is not that negligence is presumed, but that the circumstances amount to evidence from which it may be inferred by the jury."

Sufficient answer to its application to this case is that the place where the injury occurred was in the exclusive control of another, and the defect in the wire that occasioned the injury was not the fault of the electric company.

We need have no contention with the line of authorities cited by counsel for defendant in error, holding that where, in consequence of the defective construction of an electric wire or its imperfect insulation, attributable to the electric company, or when a live wire without insulation is suffered by the company to lie in a position to injure a person rightfully coming in contact with it, responsibility may attach to the company. The following cases illustrate this rule:

Jones v. Union Railway Co., 18 App. Div. 267, 46 N. Y. Supp. 321, where the plaintiff was standing at night upon the streets of the city, and a span wire used to support a trolley wire carrying a current of 500 volts broke a few feet beyond the insulator which carried the trolley, and, falling, burned through the plaintiff's hat and destroyed one of his eyes. It was held that the defendant company owed the duty of constructing its plant and maintaining it reasonably safe and secure for the public who might use the street. The liability there ensued from the want of care in construction and repair of wires owned by the company over and above the public highway.

The case of Griffin v. United Electric Light Company, 164 Mass. 492, 41 N. E. 675, 32 L. R. A. 400, 49 Am. St. Rep. 477, was where a

tinsmith was engaged in placing an iron conductor on a building, upon the side of which an electric wire ran. He received a shock from the wire by reason of a pipe coming in contact with a wire where the insulating material was worn off. The court said:

"The plaintiff was not a trespasser or a mere licensee who must take the premises of another as he finds them. He was rightfully on the premises for purposes of business. These were a source of danger unless properly insulated. * * * It (the defendant) was negligent if it failed to use reasonable diligence in seeing that its wires were kept in a state of repair. This duty it owed and at least to every person who, for purposes of business, was rightfully upon the premises."

In Thomas v. Electrical Company, 54 W. Va. 395, 46 S. E. 217, the electric company left its wires with the end detached, not properly wrapped or covered, and it was worn and dangerous. They remained in such condition for a long time, without inspection. An opera company which leased the building for a time tacked advertising banners on the balcony. At the expiration of the lease a man 21 years of age was sent up to gather the banners. He went upon the balcony to untack them, and while engaged in this work in the nighttime came in contact with one of the electric wires, which he grasped with his left hand, and was transfixed by the shock. It was held that the company was guilty of negligence in not properly insulating or protecting the wire, as against a party who had business there to perform.

In Trenton Passenger Ry. Co. v. Cooper, 60 N. J. Law, 219, 37 Atl. 730, 38 L. R. A. 637, 64 Am. St. Rep. 592, electricity escaped from a street railway and injured a horse driven on a public street. It was held that this was presumptive proof of negligence in the operation of the railway. The doctrine of res ipsa loquitur was applied to the situation.

In Devlin v. Beacon Light Company, 192 Pa. 188, 43 Atl. 962, the electric light company, in making some alterations in its line, allowed an arc light wire to lie upon the pavement in a much traveled part of the city, without guard or warning to passers-by. The plaintiff stepped upon it and received a shock. It was held that that was sufficient evidence of negligence on the part of the defendant to require it to explain.

On the other hand, the more pertinent cases are as follows: Sullivan v. Boston & Albany Ry. Co., 156 Mass. 378–379, 31 N. E. 128, presents the case of a boy who went upon the roof of a shed of a railroad company to recover a ball, and he was killed by coming in contact with two naked copper wires attached to the shed, used in the business of the company for conducting electricity. The court said:

"If the plaintiff's intestate was not a trespasser, which we do not decide, he was at most a mere licensee, and so far as he was concerned the defendant had a right to arrange and use its property in any lawful manner, and owed him no duty with respect to it, except to refrain from setting a trap for him, and from doing him intentional or wanton harm. The live electric wire with which the deceased came in contact was a lawful apparatus, used in the ordinary business of the defendant, and was not designed as a trap."

In Woodruff v. Bowen, 136 Ind. 431, 34 N. E. 1113, 22 L. R. A. 198, the defendant had erected a building which, under ordinary cir-

cumstances, was reasonably safe. It became unsafe by reason of the storage of a large quantity of goods by a tenant, and by reason of the additional fact that, in an extraordinary emergency by fire, large quantities of water were thrown into the building, causing it to collapse. Firemen, in the discharge of their duty, were killed. It was held that the owner of the building was not responsible in damages for the death of the firemen, who were on the premises under a mere license conferred by law. "The licensor owes to a mere licensee no duty except that of abstaining from any positive wrongful act which may result in injury to the licensee, and the latter takes all the risks."

In Hamilton v. Minneapolis Desk Mfg. Co., 78 Minn. 3, 80 N. W. 693, 79 Am. St. Rep. 350, it is held that at common law the owner of a building owed no duty to keep it in a reasonably safe condition for members of the public fire department who in the exercise of their duty have occasion to enter the building.

In Hector v. Boston Electric Light Co., 161 Mass. 558, 37 N. E. 773, 25 L. R. A. 554, a lineman employed by a telephone company, for the purpose of affixing wires of the company to a standard erected on the roof of a building by the electric lighting company, had an implied license to reach the roof by going up through the building. But he used a different way, and, while unnecessarily upon the roof of an adjoining building, was injured by coming in contact with an uninsulated wire charged with electricity belonging to the electric lighting company. It was held that he was not entitled to recover. Field, C. J., observed that:

"Whatever duty the defendant owed to the plaintiff as the servant of the telegraph and telephone company, under its license to that company to use the standard for the support of telegraph or telephone wires, this duty cannot be held to extend over the whole circuit of the defendant's wires, and the defendant was not required, for the protection of the servants of the telegraph and telephone company, to maintain an effectual insulation of its wires over other buildings than that on which the standard was placed, at places where the defendant had no reason to expect that the servants of that company would go in the performance of their duties in using its standard, and where the defendant had neither invited nor licensed them to go."

In Keefe v. Narragansett Electric Lighting Co., 21 R. I. 575, 43 Atl. 542, the testimony showed that the plaintiff, a girl about 11 years of age, climbed out of the window of a house in which she lived onto the jet of the adjoining house. While so walking she came in contact with electric wires owned by the tenant of that building, which were connected with the defendant's wires for transmitting electricity at the houses. The court said:

"We do not think that the action can be maintained: First, because the wires by which the plaintiff was injured were not the wires of the defendant; and, secondly, even if they had been, we fail to see that the defendant would have owed any duty to the plaintiff, since it could have had no reason to anticipate the act of the plaintiff in walking along the jet."

In Augusta R. Co. v. Andrews, 89 Ga. 653, 16 S. E. 203, a lineman for a telephone company, in working for his company, placed a telephone wire above and across a fire alarm wire, ascending the pole of the fire-alarm system for that purpose. In passing the telephone wire

over the fire-alarm wire he received an electric shock. The claim made was that the street railway company was negligent in constructing the feed wire so that it came in contact with the fire-alarm wire and charged it with a dangerous current, and that this negligence caused the injury. The claim was disallowed, on the ground that the street railway company owed him no duty and was not liable for injury that happened to him while, without permission, he was upon the pole of the fire-alarm system.

The authorities bearing upon this feature of the case are collected and reviewed in a very thorough manner in New Omaha Thomson-Houston Electric L. Co. v. Anderson, 73 Neb. 84, 102 N. W. 89, and in Trouton v. New Omaha Thomson-Houston Electric L. Co., 77 Neb. 821, 110 N. W. 569, in which it was held that a fireman who enters upon private premises for the purpose of extinguishing a fire, without the special authority or invitation of the owner, is a bare licensee, made such by public necessity, and takes the risk of the premises as he finds them. The evidence showed that for some unexplained cause a severe shock of electricity came from one of the low-pressure wires which the fireman supposed was harmless. The doctrine of res ipsa loquitur was invoked. The court said: "It is only when the defendant is under an absolute duty to prevent the results that their appearance shows negligence." There, as here, although the wire may not have been at the instant properly insulated, the party coming in contact with it did so voluntarily and unnecessarily.

In Cleveland, C., C. & St. L. Ry. Co. v. Ballentine, 84 Fed. 935, 28 C. C. A. 572, a train of tank cars, filled with petroleum, took fire, and a boy 17½ years old, out of curiosity, went upon the premises and perhaps rendered some service there. Jenkins, J., quoted the rule that:

"It is not every one who suffers loss from another's negligence who may recover therefor. Negligence, to be actionable, must occur in breach of a legal duty arising out of contract or otherwise, owing to the person sustaining the loss." Citing Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621; Kahl v. Love, 37 N. J. Law, 5.

Although the setting fire to the oil tanks resulted from the negligent act or omission of the servant of the railroad company in misplacing the switch, he said:

"That negligent act or omission was not in breach of any duty owing to Ballentine, and as to him was innocuous, he being two miles away at the time and unaffected thereby. * * * He went upon the grounds of the railroad company, where he had no right to be, and going there, at best, as a mere licensee, he was bound to take things as he found them, and he assumed the risk of the situation. Elevator Co. v. Lippert, 24 U. S. App. 182, 11 C. C. A. 521, and 63 Fed. 942. So it is held that firemen entering upon premises to extinguish a conflagration and to save property do so, not by permission or invitation of the owner, but under license of the law, and they also must take the risks as they find them. * * * The railway company owed to him no active duty—only the duty to abstain during his presence on the premises from positive wrongful act which might result in injury to him. It was not bound to remove the burning cars to another part of its yards, either in the discharge of any duty towards him, or, so far as the record discloses, in discharge of duty towards any one."

The case was tried by the learned trial judge upon a false theory of law, and the request of the defendant below for a directed verdict should have been granted.

It results that the judgment of the Circuit Court must be reversed, and the cause remanded, with directions to grant a new trial.