Louis Allegretti and Joseph Glaser, Trading as Leader Signs, Appellees, v. Murphy-Miles Oil Company, Appellant.

Gen. No. 37,807.

Heard in the second division of this court for the first district at the October term, 1934. Opinion filed May 24, 1935. Rehearing denied June 5, 1935.

CHARLES E. GREEN, of Chicago, for appellant.

LOUIS WILSON and MAYER GOLDBERG, both of Chicago, for appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

By this appeal defendant, Murphy-Miles Oil Company, seeks to reverse a judgment for $9,533 entered against it in an action tried by the court without a jury for damages to personal property owned by plaintiffs, alleged to have been caused by reason of defendant's negligence. At the close of all the evidence the court found the other defendant, Norwin Building Corporation, not guilty.

It appears that plaintiffs were in the business of manufacturing Neon and other signs, and occupied as tenants the first floor and basement, except the 15 by 25 feet portion thereof used as the boiler room, of the three-story and basement building at 1934-38 West North avenue, Chicago, Illinois, owned by the Norwin Building Corporation; that the basement was used as a shop for the manufacture of the glass tube part of Neon signs; that the boiler room contained the heating plant for the entire building, the boiler being operated by fuel oil; that located in the boiler room was a fuel oil tank of 1,000-gallon capacity with an intake pipe about two inches in diameter and an air vent about an inch or an inch and a half in diameter leading from the tank and terminating outside the building wall within one foot of each other; that on March 10, 1931, the janitor of the building, discovering that there were only 60 or 70 gallons of oil in the tank, ordered oil from defendant oil company which had been delivering oil to this building for three years; that about 10 a. m. the same day defendant's driver arrived at the premises with his tank truck containing 822 gallons of

oil; that he proceeded to the boiler room where the janitor indicated to him the amount of oil then in the tank, and it was agreed there was room in the tank for the 822 gallons of oil on the truck; that the driver, after going back to his truck, connected one end of a hose with the pump underneath the tank on his truck and the other end to the intake pipe, and proceeded to pump oil into the tank in the boiler room through the intake; that when he had pumped about 600 gallons of oil he heard an explosion; that he immediately shut off his pump and told the janitor, who was outside the building near him at the time, to run in and shut off his oil burner; that shortly thereafter defendant's driver took the elbow off the vent pipe outside the building in the presence of the janitor and said that he found the air vent clogged with ice, while the janitor said that it was "plugged up" with dirt; that the explosion blew the end out of the tank in the boiler room and clear across said room, badly damaged or tore off part of the wooden partition between the boiler room and plaintiff's premises and blew the door in said partition from its hinges.

Plaintiff Allegretti testified that the finished Neon signs were hanging from the ceiling and walls or were on benches in the shop, and that the force of the explosion destroyed all but a few of them.

Arthur Paulson, a city fireman who answered a fire call with his company, testified: "The oil tank was exploded. The end of the tank was blown out. We had the job of sweeping out the oil and stuff all over the floor." He also testified that the signs were all "broke" in plaintiffs' "place," and that "there was glass hanging from the ceiling or something; it was all shattered and pieces hanging there."

It is undisputed that the obstruction in the air vent, shutting off the egress of air from the tank, caused the explosion; that as the oil was pumped from the tank

on plaintiffs' truck to the almost empty tank in the boiler room it displaced the air in such tank, and there being no outlet for the air through the vent pipe it was compressed to the point where the tank could no longer withstand the pressure.

Walter Smith, the driver of defendant's truck, testified in part on cross-examination, as follows:

"Q. Is there any particular method of determining whether or not air is coming out of a vent pipe?

"A. Yes.

"Q. Did you ever do that on a vent pipe?

"A. Once in a while I have done it.

"Q. Can you feel the air coming out?

"A. You can.

"Q. Is it quite perceivable, or just slight?

"A. Well it is detectable.

"Q. You can tell it without any difficulty?

"A. Yes. ·

"Mr. Goldberg: Q. How often do you do that, test the vent pipe for air coming out?·

"A. Well, whenever I think of it.

"Q. Well, about how often?

"A. Maybe two or three times a year or a month.

"Q. Is that right?

"A. Sure.

"Q. How many deliveries, about, do you make a month?

"A. We will make on an average of six a day.

"Q. And sometimes you will test a vent pipe with your hand?

"A. Yes.

"Q. How do you do that?

"A. Just hold your hand.

"Q. In other words, you have to step over to the vent pipe and put your hand on it while the oil is starting to pump?

"A. Yes.

"Q. And suppose you found there was no air, what would you do?

"A. Shut it off.

"Q. Why?

"A. Because there was no air coming out.

"Q. What difference would it make?

"A. Well, the air might be escaping out in the basement or some other place.

"Q. Well, would there be any danger if no air could come through?

"Mr. Green: I object to that.

"The Court: If he knows.

"The Witness: A. There would be danger if it did not come out some place.

"Mr. Goldberg: Q. What would the danger be if the air did not come out?

"A. It would break the tank possibly.

"Q. Possibly or certainly?

"A. Well, I couldn't say.

"Q. Possibly or certainly?

"A. Possibly.

"The Court: The danger would be exactly what happened there, wouldn't it?

"A. Yes."

The oil heating apparatus in the building in question, including the boiler, fuel oil tank, and all pipes, fittings and fixtures in connection therewith, was owned, operated, controlled and maintained by the owner of the building.

Defendant claims that, inasmuch as it did not own, maintain, possess, control, operate or install the heating apparatus or any of the pipes or vents in the building in which plaintiffs were tenants, it owed no duty to them, as a company furnishing fuel oil, to inspect such apparatus or pipes or to exercise reasonable care to ascertain whether or not the tank, intake pipe or air vent under the control of the property owner or cus-

tomer were fit for the furnishing of that commodity; and that, therefore, it is not responsible for their condition or for their maintenance and cannot be held liable for injuries caused by a defect therein of which neither it nor its employees had knowledge or notice.

We think that defendant misapprehends plaintiffs' theory of its liability. We glean from plaintiffs' brief and argument that they do not rely on defendant's knowledge or notice of the defect in the air vent as a basis of liability, nor do they contend that the duty violated by defendant was its failure to inspect the premises for the purpose of ascertaining possible defects. They contend rather that the duty violated by defendant was its failure to use reasonable care in the delivery of the oil, and that a reasonably prudent man in its driver's situation would have reached over the space of one foot that intervened between the terminus of the intake pipe, to which his hose was connected, and the terminus of the air vent, and placed his hand over the open end of same, after he had started pumping the oil, to ascertain if there was free egress of air from the tank.

It strikes us that the use of this simple test was incumbent upon defendant's driver as part of the operation of the delivery of the oil. Defendant was dealing in and delivering a dangerous commodity and it owed plaintiffs the clear and well defined duty of using reasonable diligence to discover a defect which was as readily ascertainable as the one in question here.

Every case must be governed by its own particular facts and it is apparent that defendant violated its duty and failed to guard against a danger that it could and should, by the exercise of even a slight degree of care, have discovered. Even though we assume that the driver was under no obligation to remove the elbow of the air vent outside of the building in connection with his delivery of the oil, either for the purpose of

inspecting same or removing obstructions therefrom, we cannot perceive how defendant can escape responsibility for the failure of its driver to resort to the simple expedient of placing his hand over the opening of the air vent, an act that entailed neither inspection of the heating apparatus nor its pipes. Defendant, as we view it, as part of its contract to furnish oil, was at least bound to make this casual test of the vent pipe which would have immediately disclosed the danger. Such test would have involved nothing more than a mere matter of observation and would have averted the explosion. If its driver found that the air from the tank was not flowing freely through the vent, all that he had to do was to shut off his pump and refuse to make any further delivery until the vent was put in order, if he felt that it was not his duty to remove the obstruction.

Defendant's driver's evidence, heretofore quoted, clearly indicated that he knew that an obstructed air vent was fraught with danger and that he did test vent pipes "whenever I think of it." There is no claim that plaintiffs' conduct contributed in any manner to the explosion and resultant loss, and we are impelled to the conclusion that defendant is liable under the facts of this case. On its own evidence alone, defendant's failure to use reasonable care in the delivery of the oil was the sole proximate cause of the bursting of the tank.

Something is said about the failure of the owner of the building to comply with the terms of the city ordinance in its installation of the vent pipe. There is no evidence as to when the vent pipe was installed, and, as far as the record discloses, it may have been installed long prior to the passage of the city ordinance and was not subject to its terms. In any event plaintiffs had nothing to do with its installation, and, regardless of when or how the vent pipe was installed, we

fail to see how it could have affected defendant's duty toward plaintiffs. The factual situation, as it was, controlled such duty.

To support its contention that neither under the law nor the facts in this case can it be held liable defendant relies upon and cites *Clare v. Bond County Gas Co.*, 356 Ill. 241; *Middleton v. DeKalb County Gas Co.*, 168 Ill. App. 353; *Fritsch v. Atlantic Refining Co.*, 307 Pa. St. 71, 160 Atl. 699; *Pressley v. Bloomington & Normal Ry. & Light Co.*, 271 Ill. 622; *Niagara Fire Ins. Co. v. Standard Oil Co.*, — S. D. —, 257 N. W. 55.

The *Clare* case is readily distinguishable from the instant case. In that case the plaintiff's shop was piped for gas 25 years previous to the accident. Defendant furnished a gas stove, which was connected by a plumber of plaintiff's own choosing. An odor of gas was noticed, the cause of which several inspections failed to disclose, and the installation of additional pipes failed to rectify it. While a friend of the plaintiff was in charge of her shop, he struck a match in the meter closet and an explosion resulted. Thereafter it was discovered that holes in a rusted pipe under the floor had permitted leakage of gas, which caused the explosion. Our Supreme Court reversed a judgment in plaintiff's favor, principally upon the theory that the pipes were upon the premises of plaintiff, and, being within her exclusive control, no duty devolved upon defendant to inspect them.

The *Middleton* case presents a radically different situation from that presented here. In that case the gas company installed pipes for the gas supply. The plaintiff procured a rubber pipe of his own selection to connect his stove with the supply pipe terminal, which connection was made by the company under a written contract with the plaintiff. After constant use of this apparatus for three and a half years a fire took place, which the plaintiff contended resulted from the escape of gas, but which the company claimed was

caused by gasoline upon the plaintiff's premises. There was a sharp conflict with reference to the cause of the fire, which was resolved in the trial court in defendant's favor. The court held that the defendant gas company was under no obligation to inspect attachments upon the premises of a consumer where said attachments had been selected by and were under the control of the consumer.

In the *Fritsch* case the facts were essentially different from those in the instant case. There the defendant delivered gasoline to a garage which employed deceased. The storage tank was built below the concrete floor of the basement with its top even with said floor. A measuring pipe was installed in the tank with a removable cap flush with the basement floor. The intake pipe for the gasoline extended through a brick wall 14 feet in front of the garage. A coal stove in the basement, in which a fire was burning, was located 26 feet from the point where the intake pipe joined the tank and 14 feet from the measuring pipe. Defendant's servant arrived at the premises and proceeded to pump oil from his supply truck through the intake pipe until he heard shouts from downstairs that the gasoline was overflowing. The driver cut off the supply from the truck, but a fire of dangerous proportions had already broken out in the basement, which resulted in the death of plaintiff's intestate. There was no other point at which gasoline could have escaped from the tank except through the measuring pipe, the cap of which was later found in the yard behind the garage. The court held that defendant's employee was under no duty to inspect the premises where the storage tank was located and all of the evidence showed that the cap might have been removed by the deceased or one of his fellow servants. "Furthermore," the court said, "even if there had been a duty to inspect, the mere fact that the cap was off the measuring pipe when the gasoline was actually

delivered would not be sufficient to charge appellee with negligence, for there is not a line of evidence to show that it had not performed that duty and that meanwhile the cap might have been removed by someone else.''

The *Pressley* case, to which our attention is called, is concerned with an entirely different question and the principles of law therein involved have no applicability to the case at bar.

In the *Niagara Fire Ins. Co.* case, one Powers owned a garage which was insured by plaintiff insurance companies. A fire occurred, the insurance companies paid the loss, and sued the oil company for its alleged negligence in causing said loss. In the basement of the Powers garage, and under the sidewalk, there were located large storage tanks from which gasoline was drawn and retailed through pumps in front of the garage. A flood occurred on a Sunday and water entered the garage basement, causing the gasoline tanks to get out of place, with resultant leaks in the pipes and equipment. The following Thursday an agent of defendant oil company delivered gasoline to the garage, and, without observing or knowing the condition of the equipment in the basement, attached his hose from the tank wagon to the intake on the sidewalk and started gasoline running into the intake. It had been the custom for the oil company to deliver gasoline to Powers without his ordering same whenever it appeared that he needed it. The evidence was disputed as to the condition of the intake pipe at the sidewalk and as to whether or not Powers saw and spoke to the driver of the tank wagon after same had been connected by the hose with the intake. A gas furnace had been started to help dry out the basement following the flood. An employee of Powers, noticing the gasoline being delivered, went into the basement with a flashlight and discovered that gasoline was running out of the intake pipe on to the basement floor from

the tank room. This employee had no more than left the basement than an explosion occurred, followed by a fire which destroyed the building. The decision of this case was predicated upon the following facts: That Powers knew or by the exercise of ordinary care should have known that the pouring of gasoline into the fill pipe in its then condition might be dangerous in that it might leak on to the floor; that he knew that there was a fire burning in the basement within the vicinity of which gasoline might leak, and that he allowed the driver to deliver the gasoline; or that, knowing that the oil company was liable to make such delivery, he failed to notify it of the danger and failed to use reasonable care and precaution to prevent the delivery of gasoline.

In none of these cases are the facts comparable to those in the case at bar nor do we find any principle of law enunciated in any of them that would relieve defendant from the duty of exercising reasonable care at the point of intake in the delivery of the oil.

In so far as we have been able to ascertain, the question of defendant's liability is a new one in this State and must be decided in accordance with fundamental and established principles. Two of these established principles are that one shall so use his own as not to injure another, and that the law demands what is reasonable under the circumstances to avert injury. The furnishing of fuel oil for heating plants is a necessity of modern civic and industrial life, but it is in strict line with the dictates alike of morals and law that one who sells and delivers such a dangerous product should use proper care to avoid resulting harm. (*Hoffman v. Leavenworth Light, Heat & Power Co.*, 91 Kan. 450; *Pressley v. Bloomington & Normal Ry. & Light Co., supra.*)

It is urged that there was a fatal variance between the evidence and the allegations of the amended declaration. It is sufficient answer to this contention to

state that the question of variance was not raised in the trial court and that being so defendant cannot be heard to raise the question now. The record discloses that no objection was made on the trial to the admission of any evidence, nor was any motion made to strike any evidence because it was variant from the amended declaration. Neither in its motion at the close of plaintiffs' case for a finding in its behalf, nor in its motion for a new trial, did defendant rely upon or specifically point out to the court any variance between the proof and the declaration. An objection on the ground of variance is deemed to have been waived unless made promptly and specifically so that an opportunity may be afforded to amend the declaration to meet such objection. This principle is too well defined and settled to require the citation of authority.

It is next claimed that the court erred in admitting in evidence two certain written statements over defendant's objection. Plaintiff Allegretti and plaintiffs' bookkeeper testified that, because of the lapse of time, and the number, character and variety of the signs, they could not definitely remember the finished signs that were in the shop on the Saturday preceding the explosion which occurred on Tuesday, or the number and value of the finished Neon signs and the amount and value of other signs and material that had been destroyed by the explosion. As to the first of these statements both of the witnesses testified that because of labor union regulations plaintiffs' employees did not work on Saturday and that it was the practice and custom for Allegretti and the bookkeeper on each Saturday to make and prepare a written inventory of all completed work in the basement shop and discard the previous inventory when the current one was completed. The written inventory of the Saturday preceding the explosion showing signs to the number of 214 and their description, as well as 100 border tubes, was

received in evidence without objection from this defendant. It is true that the other defendant offered an objection, but that could not inure to the benefit of the oil company unless it expressly joined in same. (*Sline & Sons v. Hooper*, 164 Md. 244, 164 Atl. 548.)

The other written statement admitted in evidence over defendant's objection was what purported to be a written or hand printed statement or inventory of 202 signs destroyed as a result of the explosion, including figures which Allegretti and the bookkeeper testified represented the actual cost of the labor and materials that went into the construction of each specific sign.

It is urged that this document was inadmissible in that it was self-serving and was not made up from original records or books of account; and that the court should not even have permitted its use as a memorandum for the purpose of refreshing the recollection of the witnesses.

After this statement had been admitted in evidence by the court the parties stipulated that, if Allegretti were permitted to testify from it in reference to the amounts thereon purporting to represent the actual cost of labor and materials of each destroyed sign, he would testify that the items and figures enumerated are the items and figures that were placed on the statement either on the afternoon of the day of the explosion or the next day, and that such figures represented the value of labor and materials as determined by Allegretti when the statement was made up. The total value of the labor and materials that went into the manufacture of all the signs destroyed was $9,533, as shown by this statement.

Allegretti testified in connection with this latter statement that the next day after the explosion he and the bookkeeper went down to the basement shop to ascertain what damage was done to the signs therein;

that they took with them the inventory of the previous Saturday and checked the items thereon against the damaged and undamaged signs, and that the bookkeeper, in his presence and at his direction, wrote or printed this statement upon which she recorded the name or description of 202 signs that had been destroyed; that the fair and reasonable value of the labor and materials that went into the manufacture of the signs that were destroyed was about $10,000 or $12,000; that about two years after the explosion the business was incorporated and that he did not know where the books or records of the partnership were at the time of the trial; that, after the bookkeeper had written or printed on the statement the name or description of the signs that had been destroyed, he and the bookkeeper went upstairs; that in the construction of a sign each employee made out a separate time card, indicating the hours of labor he put in on the particular sign and that from these cards time sheets were prepared which indicated the total amount of labor performed in the manufacture of each sign; that from these time cards and time sheets, and his knowledge of the materials requisite for the manufacture of Neon signs, he advised the bookkeeper as to the value of the labor and materials which went into the manufacture of each sign; and that the bookkeeper, in his presence and at his direction, recorded on the statement, opposite each sign, figures showing the value of such labor and material.

Thelma Stein, the bookkeeper, testified to substantially the same effect as Allegretti. She also testified that the time cards and time sheets had been destroyed, not being kept for any considerable length of time after the employees had been paid.

There was no countervailing testimony as to the damages suffered by plaintiffs. Allegretti and the bookkeeper both testified that they were unable to

definitely state the value of the labor and material involved in the manufacture of the individual signs without referring to the written statement of same made immediately after the explosion, which occurred more than three years before the trial.

While Allegretti, upon defendant's objection, was not permitted to answer a direct question as to whether the entries on the statement accurately set forth the items thereon and the figures evidencing the value of the labor and materials that went into their manufacture, the substantial effect of his testimony was that the statement constituted a contemporaneous record of his past recollection of such items and figures, and that same were truly and correctly recorded at the time of the occurrence. It has been held that where a writing has been made by the witness or at his direction at the time of the fact, for the purpose of preserving the memory of it, if at the time of testifying he can recollect nothing further than that he had accurately reduced the whole transaction to writing, the writing itself may be admitted in evidence. (*People v. Greenspawn,* 346 Ill. 484; *Farmers' & Mechanics' Bank v. Boraef,* 1 Rawle (Pa.) 152; *Smith v. Lane,* 12 S. & R. (Pa.) 80, 84; *Merrill v. Ithaca & Oswego R. Co.,* 16 Wend. (N. Y.) 586; *Haven v. Wendell,* 11 N. H. 112; *Curtis v. Bradley,* 65 Conn. 99; *State v. Brady,* 100 Iowa 191; *Republic Fire Ins. Co. v. Weide,* 14 Wall. (U. S.) 375.)

In this case where there was no recollection, or at best an indistinct recollection, except that Allegretti directed the bookkeeper to make, and that she made under his direction, a true record of the facts as they existed on the Saturday before the explosion and as they existed almost immediately after the explosion, in our opinion, that record is entitled to be received in evidence.

It is contended that plaintiffs' amended declaration failed to state a cause of actionable negligence and that the trial court erred, therefore, in overruling defendant's motion in arrest of judgment. We find no merit in this contention. While the law is well settled that, even after a demurrer to a declaration has been overruled and the demurrer waived by pleading over to the merits, a defendant may invoke a motion in arrest of judgment if there are substantial defects in the declaration which would render it insufficient to sustain a judgment, such motion cannot avail against a declaration if it states a cause of action, even though defectively. In discussing this question in *Chicago & A. R. Co. v. Clausen,* 173 Ill. 100, the court said at pp. 103, 104:

"At the common law, independently of any statute, the rule was and is, 'that where there is any defect, imperfection or omission in any pleading, whether in substance or form, which would have been a fatal objection upon demurrer, yet if the issue joined be such as necessarily required, on the trial, proof of the facts so defectively or imperfectly stated or omitted, and without which it is not to be presumed that either the judge would direct the jury to give or the jury would have given the verdict, such defect, imperfection or omission is cured by the verdict.' (1 Chitty's Pl. 673.) This rule was quoted and approved in *Keegan v. Kinnare,* 123 Ill. 280, and *Chicago and Eastern Illinois Railroad Co. v. Hines,* 132 id. 161. The intendment in such cases arises from the joint effect of the verdict and the issue upon which it was given, and if the declaration contains terms sufficiently general to comprehend, by fair and reasonable intendment, any matter necessary to be proved, and without proof of which the jury could not have given the verdict, the want of an express statement of it in the declaration is cured by the verdict. Under this rule a verdict will aid a

defective statement of a cause of action, but will never assist a statement of a defective cause of action. (1 Chitty's Pl. 681.)''

Although not very well drawn in respect to plaintiffs' theory of the case as developed on the trial, we are satisfied that both counts of the amended declaration state an actionable cause of negligence against defendant and that, after the court's finding of guilt, either count is clearly sufficient to sustain the judgment. The only charge that we see that could be properly lodged against either count of the amended declaration is that of variance and that has been heretofore considered.

It is reasonable to assume that the very purpose of placing the open end of the air vent in juxtaposition to the receiving end of the intake pipe outside the building wall was to afford drivers delivering fuel oil an opportunity to test the flow of air from the reserve oil tank in the basement. Convinced that so long as the air vent could have been tested by defendant's driver after he began to pump oil through the intake, by simply placing his hand over the open end of such air vent, which was within easy reach, to ascertain if the air was coming through the vent as it was displaced in the tank by the oil, it is our opinion that defendant was guilty of actionable negligence and that the assessment of plaintiffs' damages at $9,533 was not excessive in view of the evidence as to the loss suffered by them.

For the reasons indicated herein the judgment of the circuit court is affirmed.

*Affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.