No. 18,266.

JOHN HOFFMAN et al., as Next of Kin, etc., *Appellees,* v. THE LEAVENWORTH LIGHT, HEAT & POWER COM-PANY, *Appellant.*

SYLLABUS BY THE COURT.

1. DEATH — *Occurring on Military Reservation — Electric Cur-rent—Liability of Electric Power Company.* The statute (Civ. Code, § 419) providing for the recovery of damages for death caused by wrongful act was in force before the passage of the act ceding to the United States jurisdiction over the Fort Leavenworth Military Reservation (Laws 1875, ch. 66, Gen. Stat. 1909, § 4584), and it is no defense to an action to recover such damages against a power company supplying an electric current for arc lighting on such reser-vation that the death occurred thereon.

2. SAME—*Power Company—No Control of Wires or Poles on Reservation — Not Liable for the Negligent Management Thereof.* When such power is simply furnished to a respon-sible party for use in a system of poles, wires and appliances owned and controlled by such party and in proper condition to receive the current safely, the furnishing party is not required to maintain inspection or to see at its peril that such equipment is kept safe, but so long as not chargeable with knowledge of some defect therein it may assume that such safety will be maintained, and the fact that in fur-nishing such power for arc lighting the seller undertakes to supply and maintain the necessary lamps and carbons does not change the rule. In order to hold the seller liable it must appear that it continued to furnish and turn on the current after knowing that the purchaser had permitted the equipment to become defective.

Appeal from Leavenworth district court; JAMES H. WENDORFF, judge. Opinion filed February 7, 1914. Reversed.

*Floyd E. Harper,* of Leavenworth, for the appellant. *F. P. Fitzwilliam,* of Leavenworth, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiffs recovered a judgment for the death of their minor son caused by a shock of electricity received by touching a windlass attached to an electric light pole situated on the Fort Leavenworth Military Reservation. The defendant was under contract with the government to furnish the electric current for illuminating and small motor purposes on such reservation, such current to be furnished at such times and places and in such quantities as required by the service and as directed by the officer in charge. The current for arc lamp exterior lighting was to be paid for at a flat rate, and the company was to maintain transformers or regulators at its power house so as to furnish the proper power for the lamps in use, and to supply, maintain and trim all arc lamps used for street lighting. The electricity furnished under this contract, regulated by the transformers, was a current transmitted to the lamps upon the reservation, returning thence to the company's power plant. The light pole where the injury occurred is located upon a thoroughfare or public highway and upon the reservation, near the intersection of this highway and one of the city streets. It appears that from one of the wires on the pole in question the insulation had worn off and the wire had become looped over an iron step on one side of the pole, and the chain of the windlass by which the arc light was raised and lowered coming in contact with such step became charged with electricity, and the deceased touching the windlass received the shock from which he died. An employee of the defendant attended to the care and maintenance of the lamps, trimming them about once in seven days. He had the use of a crank with which to lower and raise the windlass but was not shown to have any further duty than the care of the lamps. He stated that if anything was out of order he informed the post elec-

trician, but there was no showing that he had any instructions so to do.

Two principal contentions are made, first, that the action can not be maintained because the death occurred on the reservation, which is under the exclusive jurisdiction of the United States; and second, that having no contractual right to inspect or repair the equipment belonging to the government the defendant can not be held liable for a defect therein.

Section 8 of article 1 of the federal constitution provides that congress shall have power to exercise exclusive legislation in all cases whatsoever over all places purchased by the consent of the legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dock yards and other needful buildings. The reservation in question was not acquired in this way, but jurisdiction was ceded by chapter 66 of the Laws of 1875 (Gen. Stat. 1909, § 4584). This act saved to the state the right to serve civil and criminal process within the reservation in suits or prosecutions for or on account of rights acquired, obligations incurred or crimes committed in the state but outside the cession and reservation. It saved also to the state the right to tax railroads, bridges and other corporations, their franchises and property, on such reservation. Jurisdiction of the state in criminal matters was asserted before the act of cession in *Clay v. The State,* 4 Kan. 49. Afterwards, in *Ft. L. Rld. Co. v. Lowe, Sheriff,* 27 Kan. 749, it was held that the state could tax railroad property on the reservation, and in *C. R. I. & P. Rly. Co. v. McGlinn,* 28 Kan. 274, this court decided that the railroad fence or stock law of 1874 was in force there. In *Fort Leavenworth R. R. Co. v. Lowe,* 114 U. S. 525, the decision in 27 Kan. 749 was affirmed, and it was held that on such reservation the buildings, appurtenances and instrumentalities used by the government will be free from any such interferences and jurisdiction from the

state as would destroy or impair their use for the pur-
poses designed, but when not so used the legislative
power of the state over the places acquired will be as
full and complete as over any other place within her
limits.    (p. 539.)    It was also said that the cession of
jurisdiction was not of exclusive legislative authority
over the land except so far as necessary for its use as
a military post.    (p. 542.)    In *Chicago & Pacific Rail-
way Co. v. McGlinn,* 114 U. S. 542, the decision in 28
Kan. 274, was affirmed, and it was held that the cession
of jurisdiction was not of exclusive legislative authority
over the land except so far as necessary for its use for
a military post, and that as when the cession was made
the state law made railroad companies whose roads
were not enclosed by lawful fence liable for animals
killed or wounded, the act remained in force after the
cession.    It was said that this law was as necessary
after the cession as before, and was no more abrogated
thereby than "regulations as to the crossing of high-
ways by the railroad cars, and the ringing of bells as
a warning to others of their approach. . . . The
liability of the railroad company for the killing of the
cow did not depend upon the place where the animal
was killed, but upon the neglect of the company to
enclose the road with a fence which would have pre-
vented the cow from straying upon it." (p. 547.)    An
elaboration of the doctrine announced in the decisions
already referred to may be found in *Crook, Horner &
Co. v. Old Point Comfort Hotel Co.,* 54 Fed. 604, and
*Divine v. Bank,* 125 Tenn. 98, 140 S. W. 747.    (See,
also, *Delamater v. Folz,* [N. Y. Supr. Ct.] 50 Hun, 528.)
The statute under which the action was brought was
likewise in force before the act ceding jurisdiction was
passed, and no reason is apparent, either in principle or
upon authority, why if the defendant company was
guilty of negligence in conducting its work upon the
reservation it would not be liable.    Railroads and other
common carriers conveying passengers could hardly

expect to escape liability for negligence occurring upon the land covered by the act of cession, such effect not being within the purview or purpose of such act.

There are two theories and two lines of decisions touching the question of the defendant's liability. One is that by the act of furnishing for use so dangerous a force as an electric current a party is bound to know that the poles and wires over which it is to be conveyed are in such condition that the furnishing of such current will not endanger life or limb. The other is that the one who provides and controls the apparatus and equipment over which the current is conveyed is bound to attend to their safety, and that its mere supply to such party does not render the party supplying it responsible for the condition of such apparatus and equipment. The cases chiefly relied on by the defendant in support of the latter contention are *Minneapolis General Electric Co. v. Cronon,* 166 Fed. 651, 20 L. R. A., n. s., 816; *Gas & Electric Co. v. Speers,* 113 Tenn. 83, 81 S. W. 595; *Nat. F. Ins. Co. v. Denver Consol. E. Co.,* 16 Colo. App. 86, 63 Pac. 949; and *Fickeisen v. Electrical Co.,* 67 W. Va. 335, 67 S. E. 788, 27 L. R. A., n. s., 893. In the first of these cases the widow of the deceased sued to recover damages for a death caused by coming in contact with an electric wire suspended from the wall or ceiling of a blacksmith shop to which was attached an electric bulb for use in shoeing horses. When not in use the wire was hung on a nail driven into the side of the wall. The shop had caught fire and the deceased had entered and was trying to extinguish it when he lost his life. The inside wiring of the shop was done under an independent contract by the electric company three years before the accident and became the private property of the owner of the building. The use of the suspended wire was for his own convenience and the manner of hanging it on the wall was of his own selection. The

company had no notice of the fact that the insulation had become worn where it rested upon the nail. It was held that when such wiring became defective by the act of the owner of the building, without notice to the company, the latter was not liable. In the opinion it was said, quoting from the Denver case (16 Colo. App. 86, 63 Pac. 949) :

" 'Where, however, they are only employed to deliver the current by connection with wiring already made by the individual who owns the property, it seems to us that their responsibility ends when the connection is properly made under proper conditions and they deliver the current in a manner which will protect both life and property.' " (166 Fed. 656.)

In the Speers case the company contracted to furnish electricity for the illumination of a sign in front of a building but had no interest in or control over the wires or appliances by which the current was conducted thereto, and it was held not liable for the killing of the plaintiff's horse by electricity escaping from such wires through a defect in construction or insulation. It was said:

"It is true that electricity is a subtle and, unless controlled, a dangerous agent; yet we do not see how this fact fixes responsibility on this company when it simply furnished the electric current to the wires of Roberts, over which it had no control, and with regard to which there was on its part no duty of inspection, and when the record does not impute to it any knowledge of the defect producing the loss complained of." (113 Tenn. 86.)

In the case against the Denver Consolidated Electric Company (16 Colo. App. 86) suit was brought by a number of insurance companies to recover the amount they had paid to the depot company for a fire loss claimed to have been caused by defective wiring. It did not appear, however, that the electric company had anything to do with such wiring or its inspection or had made any agreement to keep the same in proper

condition. It was simply to furnish the current for use in the equipment provided by the depot company. The defendant prevailed in the court below and the court of appeals affirmed the judgment. It was held that there was nothing to show that the company had any knowledge of the alleged defect in the wire or in its construction, and it was said that when a company is employed to deliver the current by connection with wiring already made by the one who owns the property its responsibility ends when the connection is properly made under proper conditions and the current is delivered in a manner which will protect both life and property. In the Fickeisen case (67 W. Va. 335) the electric company sold electricity to another company to be used in lighting the streets of an adjoining city, delivering the current at a point where the wires of the two companies met. The wire of the purchasing company conveying electricity along a street was grounded, resulting in the death of a person coming in contact therewith, and the furnishing company was sued. There the purchasing company owned the equipment and had a cut-off at the end of the bridge separating the two cities for the purpose of cutting off the current from its wires. It did not appear that the furnishing company assumed any control over the equipment, and it was held not liable, the court taking the view that the one company actually delivered the electricity to the other so that a title thereto passed, which can not be said to be true here.

Four cases are also chiefly relied on to support the other contention: *Maysville Gas Co. v. Thomas' Adm'r,* 25 Ky. Law Rep. 403, 75 S. W. 1129; *Lewis' Adm'r v. Bowling Green Gas Light Co.,* 135 Ky. 611, 117 S. W. 278; *Hebert v. Hudson River Electric Co.,* 120 N. Y. Supp. 672; and *Hoboken, &c., Co. v. United Electric Co.,* 71 N. J. Law, 430, 58 Atl. 1082. In the first of these cases a boy was killed by coming in con-

tact with a charged wire connected with a trolley owned and used by a street-railway company, and the gas company was sued because it had furnished the current of electricity. It appeared that the gas company received a certain amount per month for supplying the current to the railroad company, and it was held, considering the character of the furnished product, there was a duty resting on each company to see that the wires through which it was sent were properly insulated. It was also shown that the streetcar company owned the dynamos and generators, and that the gas company only furnished the steam power by which the generator was operated. In the Lewis' Adm'r case the gas-light company furnished the electric power for a private electric line extending beyond the city limits. One of the wires became sagged and the insulation worn off, and the plaintiff's decedent, coming in contact therewith, was killed. The court said that the company could not escape its responsibility as the dispenser through the public streets and roads of such a deadly force, nor could it dispense with the duty of inspecting the wires to see if they were in proper condition, although the wires were not owned by it; that when it used the line it was its duty to see that they were in proper and safe condition, which duty required the highest degree of care to keep them safe. In the Hebert case the electric company was delivering the current over the wire in question to a power company so that the latter could in turn supply its customers for light, heat and power purposes. The place where the wire broke and the injury occurred was at a point on the line before the current had been delivered to the receiving company, and the furnishing company was held liable. In the case of Hoboken, &c., Co. a power company was called upon to install an electric meter in a certain building for the purpose of furnishing light. The company contracted with an independent and competent electrician to install the

meter, and then began to furnish the current. Subsequently a fire started in the meter box, and an examination disclosed that the electrician was probably negligent in his work. The successor of the furnishing company was sued upon the theory that it was liable for negligence for transmitting its current through a ·defective apparatus. It was held that it was the duty of the furnishing company to exercise due· care and skill, either by installing apparatus by its own agent or in examination to see that it had been properly installed by others.

The case of Thomas' Adm'r was first reported in 25 Ky. Law Rep. 403, 56 S. W. 153, the decision already referred to, 75 S. W. 1129, being practically a reaffirmance of the former one. The Lewis case (135 Ky. 611) was decided by the same court. In the Speers (113 Tenn. 83) and Cronon (166 Fed. 651) cases the doctrine of the Thomas (25 Ky. Law Rep. 403) decision was disapproved. The Fickeisen case (67 W. Va. 335), decided by the West Virginia supreme ·court of appeals, was followed by the case of *Perry v. Railway Co.,* 70 W. Va. 697, 74 S. E. 993, holding that there is no obligation upon a generating company that sells and delivers electricity to a distributing company to see that the lines of the latter company, over which the current is to be carried, are in safe condition. The decision and discussion in the Fickeisen case were ·expressly reaffirmed.

In *Schmeer v. Gas Light Co.,* 147 N. Y. 529, 42 N. E. 202, 30 L. R. A. 653, it was held that before turning on gas for the benefit of tenants in an apartment house a gas company must use reasonable precaution to .ascertain that the pipes in the building are in such condition that the gas will not flow out into the apartments of the tenants who have not applied for it, to their injury. The decision was by Peckham, J., and stated the rule to be that the gas company in making the delivery was not an insurer, but simply bound to

·exercise that degree of care which the nature of the article dealt in and the consequences to be apprehended from an accident reasonably called for; but it was stated that the court did not assume to say that when the piping had been carefully and thoroughly examined there was a continuing liability thereafter on the part of the company to see that it was kept in proper condition.  It was said:

"As the company has no control over the piping, ·does not put it in, and is not consulted about it, the principle upon which it might be held liable, in cases of this character, at the time of the first delivery of gas, if no precaution were taken at all, is simply that it would have the right to refuse to turn on, or permit others to turn on, the gas for the supply of the applicants until properly assured of the condition of the piping in other portions of the building.  Having become assured of it, and the gas being on, it would not seem that the company ought further to be regarded as liable for the continuous good condition of the piping. Here we may justly say that to impose such a liability upon the defendant would clearly be unreasonable.  It would render necessary the examination, at frequent intervals, of all the buildings in the city in which gas was used.  This would be so onerous as to be practically impossible of execution, because of the expense to the company.  The law ought not to, and does not, exact an unreasonable amount of care from any one. Under the restrictions, however, as above stated, we think the question of defendant's negligence was for the jury."  (p. 541.)

The jury found that the pole was erected and the wire steps and chain placed thereon according to the plans and specifications of the government of the United States, and had been in place about nine years; that no one representing the defendant had any actual notice that the wire was caught over the step; that the current had been turned on less than an hour when the accident occurred; that the government employed a competent and practical electrician, who stated that inspection was made every two or three months, of

the chain, pole and wires in question. The electrician testified that, according to his understanding, his assistant, who was in the habit of walking to and fro between the city and the reservation, was to keep his eyes open for trouble of the kind under consideration, and if found to repair if able, otherwise to report it. The engineer and the electrician from the military prison testified that the construction of the pole in question, including the location of its windlass and the windlass chain, was faulty. Numerous witnesses testified to seeing sparks at night, and it appears that a long time before the injury the pole in question had been on fire. It appears also that boys had been for some time in the habit of playing around the windlass, and receiving shocks by touching it. The jury found that the wire had been caught over the step about three days, and that the pole was on fire several months before the occurrence of the injury, caused by a current escaping from a wire through defective insulation to the step and chain. The defendant's trimmer testified that he had been trimming the lamp about six years, and noticed nothing wrong with the poles and wires when he was there. Were the government suable in this kind of a case, its negligence would certainly be well established. Whatever right or duty existed to be assured that the equipment was in proper condition before beginning to furnish the current, the question of liability here depends on the duty of the company afterwards to inspect and see that such equipment was kept safe. An early and leading application of the doctrine that one must so use his own property as not to injure another was the decision in *Rylands v. Fletcher*, L. R. 3 H. L. 330, that where one brings upon his land by artificial means that which would not naturally come upon it, and which is in itself dangerous, and which may become mischievous to his neighbor if not kept under control, he will be liable for damages for any mischief thereby caused, and liable

Hoffman v. Power Co.

as an insurer. Thompson, in his Commentaries on the Law of Negligence, vol. 1, § 796, suggests that persons employing for their own private advantage so dangerous an agency as electricity ought to be regarded as quasi-insurers, as towards third persons, and that one who creates such agency on his own land should restrain it at his peril. The author admits, however, that the doctrine of *Rylands v. Fletcher* has not been followed in all the American jurisdictions. (See §§ 696-714.)

The question of the defendant's liability is a new one in this state and must be decided in accordance with established principles. Two of these principles are that one shall so use his own as not to injure another, and that the law demands only what is reasonable under the circumstances to avert such injury. The furnishing of electric current to distant places is a necessity of modern civic and industrial life, but it is in strict line with the dictates alike of law, morals and humanitarianism that one who generates and sells this dangerous agency should use proper care to avoid resulting harm. When such power is simply furnished to a responsible party for use in a system of poles, wires and appliances owned and controlled by such party and in proper condition to receive the current safely, the furnishing party is not required to maintain inspection or to see at its peril that such equipment is kept safe, but so long as not chargeable with knowledge of defect therein it may justly and reasonably assume that such safety will be maintained; justly and reasonably, because the using company is presumed to act in accordance with prudence and safety until the contrary appears. The fact that in furnishing such power for arc lighting the seller undertakes to supply and maintain the necessary lamps and carbons does not change the rule, for such party has the same right as before to assume that the purchaser will act with due care. In order, therefore, to hold the seller liable it must

appear that it continued to furnish and turn on the dangerous current after knowing that the purchaser had permitted the equipment to become defective. From the time of acquiring such knowledge the seller's contract duty can not be required save on condition that such defect be remedied, for otherwise it must thenceforward furnish a dangerous force knowing that life and limb might be imperiled by reason of such defect, which neither a contract nor the law nor the common instincts of humanity could require of any one.

The jury having found that no one representing the defendant had any actual notice that the wire was caught over the step, and there being no showing that the company had knowledge of the defect which caused the injury, the defendant is not liable.

The judgment is therefore reversed and the cause remanded with directions to enter judgment for the defendant.