## Baker's Adm'x v. Kentucky & West Virginia Power Co.

March 17, 1942.

Wootton & Wootton for appellant.

Craft & Stanfill for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

The administratrix of the estate of Thelma Lykins Baker brought this action against the Kentucky & West Virginia Power Company, W. R. Adams, and Sanford Adams to recover damages for the death of her intestate allegedly caused by the negligence of the defendants. At the conclusion of the evidence for the plaintiff, the court sustained the Kentucky & West Virginia Power Company's motion for a directed verdict in its favor, and the petition as against it was dismissed. The jury returned a verdict for $5,000 in favor of the plaintiff against the remaining defendants. The plaintiff has appealed from the judgment dismissing the petition as to the Kentucky & West Virginia Power Company, and the only question presented is the propriety of the trial court's ruling in sustaining the power company's motion for a peremptory instruction in its favor.

W. R. Adams and Sanford Adams, his son, operated a bathhouse and swimming beach on the Kentucky river in Perry county. The beach and bathhouse were located across the river from the highway running from Hazard to Whitesburg, and a swinging bridge for the use of pedestrians extended across the river from the highway to the Adams property. The end of the bridge on the Adams side of the river was on a level with the second floor of the bathhouse. On the first floor of the bathhouse were lockers, and on the second floor soft drinks, sandwiches, and ice cream were sold. The footbridge was the suspension type, and the cables supporting it

were anchored to a "dead man" buried about seven feet in the ground on the Adams side of the river. Anchored to this same "dead man" was a one-half inch wire cable which W. R. Adams had stretched across the river and anchored to a rock on the opposite side. This cable was equipped so as to enable patrons of the bathing beach to ride across the river by swinging from a triangular bar attached to a wheel which ran over the cable. The cable was suspended at an angle, the end anchored to the rock on the river shore being much lower than the end on the opposite side of the river, and the patron who grasped the triangular bar and swung from the platform constructed for that purpose, carried by gravity, traveled at considerable speed until his body hit the water. The beach house was erected in 1930 by W. R. Adams who owned the land and about 100 yards from his residence, which was located on the same side of the river. A year or two later he purchased a secondhand Delco light plant and installed it in a small house about six feet square near the beach house. He wired the beach house and also his residence. The Delco plant generated 32 volts of electricity, but he used wire which was capable of carrying 115 volts. One set of wires ran from Adams' residence to the beach house, and another wire ran from his residence to the building housing the Delco plant and from there into a locker room in the basement. This wire passed within eight or ten inches of the trolley cable. There also were wires running across the river, one near the swinging bridge. Electric light bulbs were attached to these wires for the purpose of lighting the bridge and the bathing beach. All of the work in wiring the residence, beach house, and the grounds was performed by W. R. Adams who was a telephone lineman.

Early in the year 1937 the Kentucky & West Virginia Power Company constructed a transmission line to the town of Viper, which passed over the land owned by W. R. Adams, and the power company purchased from him a right of way. After the line was constructed, W. R. Adams made application to the company for electricity to be furnished to his premises. The power company agreed to furnish electricity to a meter to be installed by it on Adams' house, and the power company did run its service wire from its transmission line to the meter located at Adams' residence some time early in 1937. The power company installed the meter and Adams connected his wiring to the meter. Thereafter the Delco plant was

not used. The electricity furnished by the power company went into the wiring in Adams' residence and was then transmitted through wiring which Adams had installed to the beach house and to the beach. The management and control of the beach house was turned over to Sanford Adams by his father. Later they had some difficulty and were not on speaking terms. W. R. Adams sent word to his son to have a meter installed at the bathhouse, and to cut the wiring leading from the residence to the bathhouse and beach as he, W. R. Adams, did not wish to furnish electricity to his son. Sanford Adams thereupon made an application to the Kentucky & West Virginia Power Company for electric current to be furnished to him through a meter installed at the beach house. The company did install a meter at the beach house and ran a service wire to it from the transmission line. At the time the meter was installed, Sanford Adams asked one of the employees of the power company to cut the two wires which ran from the residence of W. R. Adams to the upper gable of the beach house. The employee told Sanford Adams that this was not in the line of his duty, and that Adams would have to do it himself. Sanford Adams told the employee he was afraid to cut the wires, and asked him as a favor to him to do it as his father had demanded that the wires be cut loose from the beach house. The employee of the power company then cut the two wires pointed out to him by Sanford Adams. The employee was not requested to cut any other wire, and Sanford Adams testified that he did not know at that time there was another wire leading from his father's residence through the house where the Delco plant was located into the beach house.

On July 31, 1938, Thelma Lykins Baker, a young woman about 30 years of age, visited the bathing beach, accompanied by her brother. They had been at the beach two or three hours when Mrs. Baker remarked that she wished to take one ride on the trolley cable before she left. She grabbed the triangular bar and swung out over the river, but when her feet struck the water her body appeared to stiffen and she did not release her grasp on the steel bar. Realizing that a current of electricity was passing through her body, some one ran to the beach house and threw the switch. Nothing happened, and he then ran to W. R. Adams' residence and threw the switch and when this was done Mrs. Baker's body dropped into the river. When her body was re-

moved from the water she was dead apparently from electrocution. An inspection of the wiring disclosed that the cable on which she had ridden had come in contact with the electric light wire leading from the Adams residence to the basement of the beach house. The insulation of the light wire was worn off at the point of contact. W. R. Adams testified that a few days before the accident a workman employed by his son tightened the cable and took up the slack which had developed from continuous use by the patrons of the bathing beach. After the cable had been stretched and tightened it was within an inch of the light wire, but at that time the insulation on the light wire was in good condition.

The appellant, in asking for a reversal of the judgment, invokes the principle that a company distributing electricity is held to the highest degree of care to keep its lines in safe condition. It is conceded, however, that a company distributing electricity is not liable for any injury arising solely from defects in the wires and appliances used for electric lighting purposes where they are not under its control and it is without knowledge of the defective condition. The proof introduced by appellant showed that W. R. Adams installed the wiring in his residence, in the beach house, and on the adjacent land long before appellee's transmission line was constructed through the Adams farm, and that appellee, at Adams' request, merely ran a service wire from its transmission line to the Adams residence. It installed a meter in a box furnished by Adams attached to the side of his house. The contract between Adams and the power company for the right of way for the transmission line had nothing to do with the service wire leading to the residence, and gave no right of inspection to the company of the wiring on the Adams premises not installed by it. Beyond the meter the lines were within the exclusive control of the owner of the premises, and the company was under no duty to inspect them.

Some point is made of the fact that an employee of appellee cut two wires leading from the residence to the beach house and failed to cut a third wire which entered the beach house at another point. Appellant's own proof showed that the act of the employee was outside the line of his duty and in violation of the rules of the company, and, furthermore, that he was not informed of the presence of the third wire or that it led to the residence. Ken-

tucky & West Virginia Power Company v. Ratliff, 221 Ky. 517, 299 S. W. 166; Ratliff v. Kentucky & West Virginia Power Company, 232 Ky. 262, 22 S. W. (2d) 620. The general rule is stated in 18 Am. Jur., Electricity, Section 102, as follows:

> "It is generally held that where the electric wires or other appliances which have caused injury are not owned or controlled by the company furnishing the power, such company is not liable for the damage sustained. The company furnishing the current is not bound to inspect such lines, wires, and appliances to discover defects in insulation or other dangerous conditions; and unless the current is supplied with actual knowledge of such conditions, its responsibility ends when connection is properly made under proper conditions and it delivers the current in a manner which will protect both life and property."

The decisions in this jurisdiction are in accord with this rule. Kentucky Utilities Company v. Sullivan's Adm'r, 237 Ky. 772, 36 S. W. (2d) 380; Smith's Adm'x v. Middlesboro Electric Company, 164 Ky. 46, 174 S. W. 773, Ann. Cas. 1917A, 1164. It is not claimed that more than 110 volts of electricity passed through appellee's service wire to the lighting system on the Adams premises.

The court properly sustained appellee's motion for a directed verdict in its favor, and the judgment is affirmed.