**UNION PACIFIC RAILROAD COMPANY, a Corporation, Appellant,**

v.

**LaVerl JOHNSON and Joleen Johnson, Husband and Wife, and Pacific Fruit Express Company, a Corporation, Appellees.**

**No. 14498.**

United States Court of Appeals
Ninth Circuit.

May 11, 1956.

Rehearing Denied Aug. 3, 1956.

428

Bryan P. Leverich, Salt Lake City, Utah, L. H. Anderson, E. C. Phoenix, Pocatello, Idaho, for appellant.

George R. Phillips, B. W. Davis, Louis F. Racine, Jr., Pocatello, Idaho, for appellees.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Plaintiff LaVerl Johnson on November 4, 1950, received a terrific shock from electricity while working in a transfor-

mer sub-station of the Pacific Fruit Express Company at Pocatello, Idaho. He, as a laborer of Pacific Fruit, had been sent by his supervisor into the enclosure surrounding the sub-station to do some painting. Not knowing that wires which were part of the lightning arrester mechanism carried a powerful load of high voltage electricity, he came in contact with one of the wires. As a consequence of this, he had to suffer the amputation of both legs below the knees and of his right arm close to his shoulder. It is hard to imagine a more serious injury.

Plaintiff receives a certain modicum of compensation under the Idaho industrial compensation statutes which is charged against his employer, Pacific Fruit Express. Moreover, in the U. S. District Court in Idaho he sought and recovered judgment against the Union Pacific Railroad Company, a corporation and citizen of Utah, in this diversity case. His jury award was the sum of $225,000. Naturally Union Pacific has appealed.

Pocatello seems to be a junction or division point on the railroad. At least, we glean from the record that the servicing operations of both the railroad and Pacific Fruit are rather extensive at Pocatello. There Pacific Fruit re-ices refrigerator cars in transit. Johnson did many jobs about the place, but he was not an electrician and seems to have known little about the dangers in an old fashioned sub-station, which this was.

First, we should relate the history of the transformer station. For reasons of economy, an arrangement was made in 1925 between the Oregon Short Line Railroad, (the predecessor company of Union Pacific) and the Pacific Fruit Express that the railroad would buy all of the electricity at Pocatello needed for the two. The wiring would be rearranged and Pacific Fruit would take electricity off of the Union Pacific line, thence through a transformer located within an enclosure, then to a meter, and then over a line running to places of consumption by Pacific Fruit. This arrangement had the approval of Idaho Power Company, the utility supplying the electricity.

Oregon Short Line built the sub-station containing the transformer within a high enclosure. The equipment and wiring for the day it was built was modern. It was a "package" unit supplied by one of the large electrical equipment manufacturing companies. By contract, Oregon Short Line was reimbursed by Pacific Fruit for the cost of the new station and necessary wiring. The sub-station became the property of Pacific Fruit. It is clear that the ground on which the station stood was the subject of a leasehold to Pacific Fruit. Through the years, a majority of the electrical work done at Pocatello for Pacific Fruit was done by Union Pacific electricians. For this work, Pacific Fruit was bound to compensate and did compensate Union Pacific after it took over the railroad line from the Oregon Short Line.

The economic advantage of the whole arrangement to the companies was this: Either Union Pacific could get a cheaper rate than Pacific Fruit or there was a rate structure which grew progressively lower with greater consumption which was achieved by combining the intake of the two over one line from the local utility, the Idaho Power Company. The arrangement was that the metered consumption of power by Pacific Fruit, plus a ten percent addition charged to loss on transmission and to overhead, would be deducted from Union Pacific's total reading for the electricity, thus getting Union Pacific's net consumption. Then the total bill would be pro-rated, Pacific Fruit each month reimbursing Union Pacific for the former's aliquot portion.

At the time of Johnson's injury, there seems to have been little change in the station from the time it was built. When he entered the enclosure to do his assigned painting, using one of the keys to the enclosure in the possession of Pacific Fruit supervisors, he had been informed by someone in authority in Pacific Fruit that the electricity had been cut off. To completely deaden the sub-station, four switches should have been pulled. Only one switch was disconnected. This was the switch carrying

the current to the meter and thence out of the sub-station to the Pacific Fruit places of consumption. Three switches that left the wires which were a part of the lightning arrester mechanism still energized with electricity had not been pulled. With one of these wires, Johnson came in contact. For one trained in electric apparatus, to take hold of the wire as Johnson did, would have been obvious negligence. Here the conditions under which the Pacific Fruit sent Johnson in to the place seems to have been dangerous. At least as to Pacific Fruit it could not be less than a question of fact on negligence, if theirs had been a common law liability.

■ Two contentions, we lay to one side immediately. Union Pacific claims it was not an electricity utility. And it says it never sold any electricity to Pacific Fruit: Pacific Fruit was just paying the Idaho Power Company for its own electricity. In the face of the billing to Union Pacific for the whole and the rebilling to Pacific Fruit by Union Pacific, we cannot see that there was anything but a sale of electricity from Union Pacific to Pacific Fruit Express.

■ On the other hand, Johnson argues that the electricity which injured him in the sub-station had not yet passed through the meter of Pacific Fruit, thus it still belonged to Union Pacific and Union Pacific had a duty to take care of the electricity until it reached the meter. Of course, many cases turn on nice distinctions, which are unfortunately unavoidable. Here there is nothing in the contract clearly delineating at which spot in the wire electricity became the property of Pacific Fruit. Under such circumstances, we would think the presumption would be that the title to the electricity passed at the point where control and dominion of the electricity passed from one company to the other. Surely, this would be not later than the point where the incoming wires went into the sub-station enclosure.

■ One of Johnson's claims here is undoubtedly grounded on the proposition that Union Pacific maintained joint control of the sub-station. If so, Union Pacific is certainly in a dangerous position in the case. Johnson produced some testimony that certain Union Pacific men had been in and around the sub-station on the day in question doing certain work and also at some other times. Even though this was not work charged for by Union Pacific, as was usually done, at worst from Union Pacific's standpoint, the activity was subject to the inference that it was repair or maintenance work which should have been charged for as it is to the inference that it was work done intentionally for Union Pacific as a part of joint control. The fact that Pacific Fruit (not disputed) always kept the only keys to the enclosure is almost conclusive on the matter of control. While railroad employees discharging the ordinary duties of persons in their capacities working for railroads may be presumed to be acting in the scope of their authority, we think no presumption can be drawn of joint control when they are casually found in a place where there is no showing they have a right or duty to be or if there within the scope of their authority, their presence is consistent with engaging in their employer's work as an independent repair contractor. When under the contract, Pacific Fruit was obligated to maintain the station, although it from time to time hired Union Pacific to do so, and occasionally someone else, we think to overcome the contract arrangement and establish joint control of the station someone of substantial authority with Union Pacific would have to be connected up with some joint control activity. Otherwise, the contract arrangement should govern.

No Idaho case is cited by either party which seems to us to conclusively answer the problems presented here. Of course, if there were such a case, this case wouldn't be here. Therefore, this court must proceed to reason the case along lines that it thinks would appeal to an Idaho court.

It is not to be gainsaid that the sub-station here is outmoded. It perhaps

could not have been built under regulations in force at the time of Johnson's injury. Today modern techniques in building such stations would not leave any wires such as Johnson came in contact exposed where he could easily touch them. There are new methods for taking such wires away from the transformer. There are improved types of arresters which make such enclosures much less dangerous.

█ Union Pacific cannot be charged for defective original construction, if it had been originally defective, because it did not build the station. The question is: Did it have a duty to stop sending its electricity into the sub-station, which had become outmoded and a hazard to the uninitiated who might be admitted without proper precautionary instructions.

Much is said here of negligence, proximate cause, intervening and superseding causes. We think it possible that there was at least a question of fact whether it was to be anticipated that Pacific Fruit would sooner or later let a man unfamiliar with electricity and safety measures into the enclosure without the switches all turned off.[1] Perhaps, it was foreseeable that sooner or later someone would get "mixed-up" with exposed and energized wires running around at points less than full body height.[2]

Plaintiff relies heavily on the appliance cases. Perhaps generally they may be summarized as holding that a supplier of gas or electricity has no duty to go on to the premises of his customer and look for defective appliances.[3] But if he knows of defective appliances, he has a duty to stop supplying his product or suffer with the owners of the appliances the consequences for injuries to third parties.[4] And we assume that the rule is the same for equipment as for appliances. As we understand the appliance rule, the supplier with knowledge of the customer's appliances is held to be obliged to not furnish his product to appliances which *cannot* receive the product safely.

We think it one thing when a company turns its gas into lines which carry into a leaking stove known to it to be leaky or turns its electricity into new electric wires improperly installed and known to contain the possibility of fire at an early moment if the wires are energized. Usually the supplier has a duty there. Perhaps the duty also exists when a known hazard arises from the owner's failure to maintain or repair or restore equipment to its original condition.[5] Perhaps there the supplier has a duty to shut off his product. Beyond that, we do not think the cases go.[6]

But we are not convinced that when a customer has an appliance maintained in its original condition of repair and function, capable of use by the trained, capable of use with safety by the untrained if properly cautioned, that the supplier has any duty or right to cut off the supply of his product (which he is obligated by contract to supply) because the customer has not modernized his plant and has not put in the latest safety devices, has not rebuilt to a high safety standard.

---

1. A serious question is posed as to whether plaintiff Johnson is not precluded here on causation under the decision of Chatterton v. Pocatello Post, 70 Idaho 480, 223 P.2d 389, 20 A.L.R.2d 783.

2. In this connection, the cases of keys left by owners in automobiles with a resulting theft of the automobile and a negligent injury to an innocent bystander (while the car was driven by the thief) may not be inapposite. See Gower v. Lamb, Mo. App., 282 S.W.2d 867; Richards v. Stanley, 43 Cal.2d 60, 271 P.2d 23.

3. Minnesota Electric Light & Power Co. v. Hoover, 102 Okl. 270, 229 P. 285.

4. Hoffmann v. Leavenworth Light, Heat & Power Co., 91 Kan. 450, 456, 138 P. 632, 50 L.R.A.,N.S., 574.

5. Bristol Gas & Electric Co. v. Deckard, 6 Cir., 10 F.2d 66. (There may be some question whether the Bristol case on its facts represents the weight of authority.)

6. See Kelly v. Duke Power Co., 4 Cir., 97 F.2d 529.

We analogize to the case of a band saw. For some woodworking operation it is possible to install safety devices that make it very difficult to get one's fingers into the saw. But it was not always thus. Earlier band saws had little protection and it was quite foreseeable that a person around one of the earlier types was apt to get his fingers in it. We think there is no case that requires the vendor of electricity to require that his customer modernize his equipment to comply with improved safety developments when the equipment can be operated safely by the trained and safely by the untrained if properly cautioned.

If we make an exception for the tragic LaVerl Johnson, which we do not see how we can, we do not know where we could stop. Wouldn't it mean that every supplier of gas would have to be sure that every stove had the most modern safety devices? Wouldn't it mean that it would be a jury question against the supplier of electricity who sold it to one having an old fashioned electric heater into which a child easily gets his fingers —if it could be shown that modern heaters have better protection which keeps fingers out?

Union Pacific raised other points not necessary to consider in view of our conclusions here.

■ Upon the basis of our belief that there was no duty of Union Pacific to withhold electric current here, we hold the trial court should have granted defendant's motion for a directed verdict at the close of all the evidence. The case will therefore go back under a mandate to enter judgment for the defendant.

Probably the better school of "judging" holds to the view that one should forthrightly pronounce one's decision and say no more. However, this is a hard case. The result we reach brings us no pleasure or happiness. We wish we could see it otherwise.

But, as we look at it, Johnson is entitled to no more than his established claim on his Idaho workmen's compensation as against Pacific Fruit Express.

We leave him where so many others in Idaho must be left—with only the claim arising out of his employment.

Judgment reversed.