The ISMERT–HINCKE MILLING COMPANY, Appellant,

v.

The UNION PACIFIC RAILROAD COMPANY, Appellee.

No. 5327.

United States Court of Appeals Tenth Circuit.

Oct. 23, 1956.

Rehearing Denied Nov. 23, 1956.

Solbert M. Wasserstrom, Kansas City, Mo. (Byron M. Gray, Topeka, Kan., and Philip L. Levi, Kansas City, Mo., were with him on the brief), for appellant.

Carl Enggas, Kansas City, Mo. (O. B. Eidson, Topeka, Kan., Melvin J. Spencer, Kansas City, Mo., Lillard, Eidson, Lewis & Porter, Topeka, Kan., Watson, Ess, Marshall & Enggas, Kansas City, Mo., were with him on the brief), for appellee.

Before HUXMAN, MURRAH and PICKETT, United States Circuit Judges.

HUXMAN, Circuit Judge.

This action was instituted in the United States District Court for the District of Kansas by the Ismert-Hincke Milling Company, herein called the Shipper, against the Union Pacific Railroad Company, herein called the Carrier, to collect $60,320.81, together with interest and attorney's fees for loss suffered to shipments of goods by flood waters in Carrier's Topeka, Kansas, Yards, during the 1951 flood. The ultimate issue was whether the loss was caused simply by an act of God or whether the negligence of the Carrier in failing to remove the shipments from the flood contributed thereto. Trial was had to the Court. It decided the issues in favor of the Carrier and the Shipper has appealed. The sole question on appeal is whether the Court's findings are supported by the record.

The amended complaint alleged that the Shipper delivered seventeen cars of wheat, flour and feed to the Carrier from June 27, 1951, to July 11, 1951. Three cars were delivered prior to July 9, nine were delivered before July 11, and five were delivered on July 11. The allegation of the complaint was that the Carrier had breached its duty to carry and deliver this merchandise safely and had failed to safeguard these shipments by allowing them to remain unprotected and unmoved to a place of safety in face of imminent peril of flood. The complaint recites the flood stages prior to the inundation of the yards and the flooding caused by breaks through the North Topeka dikes.

The Carrier's answer was a general denial of liability and affirmatively pled that the loss was a result of an act of God and that liability for such loss was excluded under the terms of the uniform bill of lading. It is conceded that the 1951 flood in Topeka was an act of God.

█ There is no disputed issue of law in the case. The Carrier was not liable for loss resulting solely from the flood, an act of God, but the fact that an act of God occurred and that it was

the immediate or proximate cause of the loss would not relieve the Carrier from liability if in the face thereof it failed to act as a prudent person would under such circumstances and failed to take reasonable available means to avoid or minimize the loss resulting therefrom. Such conduct would constitute negligence on its part. Such negligence would mingle with the act of God as an active and cooperative cause and would impose liability upon the carrier.[1]

As stated, this is strictly a fact case and the permissible conclusions that may be drawn therefrom. We are presented with a maze of conflicting evidence and our sole function is to determine whether the findings of fact and conclusions of the trial Court find adequate support in the record. In this welter of conflicting evidence there is testimony which would support a judgment for the Shipper. The trial Court, however, rejected this evidence and based its findings and conclusions on other evidence. Since our duty is to determine whether there is sufficient evidence to support the Court's finding, we do not set out the evidence favorable to Shipper but confine ourselves to such facts as in our view support the judgment of the trial court.

Prior to the 1951 flood, the most devastating flood of the present century in Topeka occurred in 1903. At that time the crest of the Kaw River rose to 32.7 feet. Much improvement and flood prevention work had been done along the banks of the river since that time. A dike was erected along the north side of the river in about 1912. Since that time no serious flood damage has been suffered by North Topeka where the Carrier's yards are located. During the months of June and July continuous excessive rains occurred in the Kaw River watershed. On June 30, 1951, the waters of the Kaw River rose to 28.92 feet and the dikes held with the assistance of sandbags, some of which were furnished and transported by the Carrier. Thereafter, the water level fell from a reading of 28.92 feet to 15.91 feet at 2:00 a. m. July 10, 1951. In the next 32 hours the river rose to 29.29 by 10:00 a. m. on July 11; then the river fell for four hours and the gauge height increased only about one foot in the next fourteen hours. At 1:05 a. m. July 12, less than forty-eight hours after the river began to rise again, the North Topeka dike broke and the Carrier's yards were inundated. The river continued to rise to reach an unprecedented crest of 36.34 at 6:30 a. m. July 13.

In addition to these weather reports, the following incidents throw light upon conditions in Topeka and upon the thoughts and opinions of the Officials of the City and of private persons who would be affected by a break in the dam. There were other confusing reports from various sources as to the flood conditions in the river watershed to the west of Topeka. At 10:00 p. m., July 10, the Mayor addressed the City over Radio Station WREN and the Station was kept open for twenty-four hours, due to the critical situation. Another broadcast was made by the Mayor and the Chief of Police at 2:00 a. m., July 11, giving the current situation. At 11:38 a. m., July 11, the Weather Bureau forecast a crest of 33 feet to reach Topeka by 6:00 p. m., July 12. The dike broke seven hours before the time for this crest fixed in the broadcast. There is evidence that Carrier's personnel engaged in strengthening the dike and the levee to the west and east of the dike did not know of the 11:38 a. m. broadcast of a 33 foot crest. There is further evidence that Goodyear Tire and Rubber Company, located in the flood area, took no steps to evacuate or minimize its loss if a flood occurred. So also the Shipper continued to load products from the first floor of its mill into Carrier's cars until about 2:30 p. m., on July 11. There is a dispute in the evidence whether a crest of 33 feet would flood North Topeka or whether the dams would hold. These facts are

---

1. 9 Am.Jur. 854, Carriers § 713; 13 C.J.S., Carriers, § 83, p. 166; Farr Co. v. Union P. R. Co., 10 Cir., 106 F.2d 437.

recited to show the indecision and confusion in the minds of officials and business men who would be affected by a flood with respect to whether one would occur.

During the afternoon of July 11, the Carrier exerted all its efforts toward strengthening the bank and raising the embankment at each end thereof, which was lower than the dike. It had two section foremen, two crews and the division engineer at the west end of the Topeka Yards, and two section foremen, three crews, a bucket gang, and the general roadmaster at the east end, all working on the tracks. Its switch engines were busily engaged in hauling gravel to these points. As stated, there is evidence that during this time none of them or any other personnel of the Carrier knew of the 11:38 forecast predicting a 33 foot crest.

As above indicated, no attempt has been made to exhaust the maze of evidence, either pro or con. We, however, believe that the above outline fairly reflects the situation as it existed in Topeka from July 10 to July 12, 1951. It seems to be without doubt that the Carrier could not have carried on its operations of strengthening its tracks and dike and the approaches thereto, as it did on July 11, and at the same time undertake the evacuation of its yards. Whether at 11:38 a. m., on July 11, a reasonably prudent person should have concluded that a flood was inevitable, should have abandoned all its repair operations and devoted itself entirely to the evacuation of its yards is a debatable question. Whether a reasonable person would have concluded at noon of July 11 that under then existing conditions a flood would ensue is determinative of this case. If such was the logical conclusion of a reasonable person, the Carrier should have abandoned its work on the dike and should have devoted all its energy and resources to the evacuation

of its yards, and the failure to do so would under such conditions constitute negligence on its part for which it would be liable.

As late as noon on July 11, the Carrier was faced with the decision whether it would try to protect its tracks, strengthen the dike and its approaches, or abandon all such efforts and evacuate. We cannot say from a consideration of the entire record that there was but one course for a reasonably prudent person to pursue and, therefore, we are not warranted in overturning the Court's findings of fact and conclusions. In retrospect, of course, it is obvious that the flood was inescapable and that all effort should have been directed to evacuation of persons and property. But hindsight is not the test. Foresight is the test to be applied to determine whether a man acted prudently.[2] No one accurately appraised the gravity of the situation. The flood was much more severe and came much sooner than was anticipated by anyone. This was due to the fact that unheard of torrential rains fell without advance notice in the watershed. Under these facts we are not prepared to say upon a consideration of all the evidence that the Carrier acted imprudently or reached an erroneous decision which a reasonable person would not have reached. We are forced to conclude that the Court was well within the exercise of a sound discretion in concluding that the Carrier was not guilty of actionable negligence and that is acts did not contribute to the loss and was, therefore, not liable. Shipper cites a number of cases to establish liability. These have been considered by us. Without analyzing them, it is sufficient to say they were decided on facts contrary to the facts found by the trial Court in this case.

The contention is made that the record shows that a substantial number of cars could have been removed after giving

2.  Farr Co. v. Union Pacific R. Co., 10 Cir., 1939, 106 F.2d 437, 439; Hunter Packing Co. v. Baltimore & O. R. Co., 7 Cir., 1954, 210 F.2d 448, 453; Gerber v. McCall, 1953, 175 Kan 433, 264 P.2d 490, 493.

the official alarm at 11:38 a. m., on July 11 that a flood was certain. The contention presupposes as a fact a situation which is much in dispute. Furthermore, the Court found that "Few, if any" cars could have been evacuated after 11:38 a. m., July 11. We think this finding finds support in the record. Also, there is no showing that Shipper's cars, or some of them, were so positioned that they could have been evacuated after that time.

Throughout the trial and in this Court the Shipper pitches its case on the contention that as a reasonably prudent person the Carrier should have realized at least by noon on July 11 that an act of God which would inundate its yards was impending and inevitable and, therefore, should have devoted all its efforts to vacate its yards. As we have pointed out, the evidence does not conclusively compel this conclusion. In that condition of the record, even assuming that we as triers of the facts might have agreed with the Shipper's contention, yet as a Court of review we cannot say that the trial Court's findings and conclusions are not supported by the record.

Affirmed.