THELMA NAKI *v.* HAWAIIAN
ELECTRIC CO., LTD., A HAWAII CORPORATION.

No. 4771.

June 4, 1968.

Richardson, C.J., Mizuha, Marumoto,
Abe and Levinson, JJ.

OPINION OF THE COURT BY LEVINSON, J.

The trial court, sitting without a jury, held the defendant, Hawaiian Electric Co., Ltd., liable for injuries the plaintiff, Mrs. Thelma Naki, sustained when she came in contact with her copper radio antenna wire, energized as a result of resting on a bare spot on her electric wires. The trial court found the defendant negligent on three grounds: its trouble shooter failed to inspect the plaintiff's premises properly and thereby to discover the dangerous condition which resulted in the plaintiff's injury; he failed to warn the plaintiff of the dangers which might exist; and he failed to turn off the power between the utility pole and the plaintiff's house.

The judge orally announced that he would award the plaintiff $15,130, but the judgment filed May 13, 1964 was for only $5,130. The plaintiff filed a motion for reconsideration of the amount of

damages. Following oral argument on May 25, 1964, the court orally denied the motion but did not enter a written order. The defendant filed its notice of appeal, and the plaintiff filed her notice of cross-appeal. We dismissed that appeal as premature and remanded the case to the trial court, 50 Haw. 85, 431 P.2d 943 (1967). The order was entered on April 17, 1968 and the case is now before us on the merits.

For the most part the facts are undisputed. The defendant maintains a utility pole on the side boundary of the plaintiff's property, near the back boundary. The pole serves several houses by separate cables. The cable running to the Furtado house, in back of the plaintiff's house, passes under a coconut tree in the plaintiff's back yard. None of the other cables from the utility pole passes under the tree. The plaintiff had a bare copper radio antenna wire over the top of her house attached to a tree in front of the house and to the coconut tree in the back yard. A portion of the insulation on the plaintiff's outdoor electric wire attached to the cable serving the plaintiff's house had deteriorated and part of the electric wire was exposed.

It had rained the night before and the morning of the accident. The sky was cloudy and the ground was damp. On the morning of the accident, the plaintiff was awakened by a noise which probably was the sound of a cluster of about a dozen coconuts from the tree in the back yard striking the ground. From her window she saw that the Furtado's electric service line had been knocked down. She believed that her electric stove was functioning improperly and called her husband to determine what to do. In accordance with his instructions, she went outside and turned off the switch at her meter box. This prevented current from flowing past the meter box into the house. It did not, however, de-energize her service line between the utility pole and the meter box. Mrs. Furtado told the plaintiff that she had called the defendant because she had no electric current. The plaintiff returned to her house to dress.

Within a short time, Mr. Ching, a forty-year employee of the defendant, arrived to investigate the Furtado's loss of power. He discovered that the Furtado service line had been completely broken at both ends, apparently by the force of the falling coco-

nuts. No current was running through the broken wire and there were no loose cables hanging from the pole. The wire on the ground was not dangerous and was not involved in the accident. Mr. Ching decided to determine whether any of the other service lines from the utility pole had been affected by the breaking of the Furtado line. From the Furtado yard he observed that the plaintiff's line had not been broken. The plaintiff gave him permission to enter her yard to determine whether electricity was flowing between the pole and the meter box. In response to his question concerning the location of the meter box, she testified she told him she would show him and that she had turned off the current earlier. He testified she told him where the meter box was located and she said nothing about turning off the current.

After this brief discussion, Mr. Ching walked the short distance to the meter box at the back corner of the house. The plaintiff followed him, standing out from under the eaves. About the time when he closed the switch at the meter box he heard the plaintiff yell. She testified that she did not see the wire that touched her arm. There is no evidence indicating how she came into contact with the radio antenna wire. We can only assume that a gust of wind may have blown it against her, that she walked into it, or that she moved her arm into it. Mr. Ching did not touch the wire.

After attending to the plaintiff's injuries, Mr. Ching returned to the plaintiff's yard and discovered a thin, broken, uninsulated copper radio antenna wire hanging down from the eaves at the side and near the back of the house. He discovered that a portion of the outside wiring, which the consumer rather than the power company owned and was contractually responsible for maintaining, was deteriorated and exposed. The antenna wire, apparently broken by the same coconuts which broke the Furtado cable, had become wrapped around the bare spot and thereby had become energized.

## Basis of Liability

To be held liable for the plaintiff's injuries, the defendant, among other things, must have owed the plaintiff a duty, and it must have failed to fulfill that duty. We have long discarded

the concept of liability without fault in connection with the furnishing of electricity.

At the outset it is clear that Mr. Ching's throwing the meter box switch did not provide the current to energize the radio antenna wire. The portion of the electric wire which the radio antenna wire came into contact with and which energized it was controlled by a switch on the utility pole. The meter box switch had no control over the flow of current between the utility pole and the meter box.

## Duty to Inspect

The trial court did not indicate clearly the nature of the duty to inspect which it found that the defendant failed to fulfill. It is well established that a power company owes no duty to inspect or to repair its customer's wires. *Minneapolis Gen. Elec. Co.* v. *Cronon,* 166 F. 651 (8th Cir. 1908) ; *Baker's Adm'x* v. *Kentucky & W. Va. Power Co.,* 290 Ky. 38, 160 S.W.2d 360 (1942). The burden imposed on the company if it were required to inspect every customer's privately owned wires and appliances would impair substantially the company's ability to perform its vital function. It might well force the company to discontinue serving private residences. The defendant introduced uncontroverted evidence proving that the bare spot was on that portion of the wire owned and controlled by the plaintiff. If there was negligence in failing to discover and to repair the defective wire, it was the plaintiff and not the defendant who was at fault.

This is not to say that the defendant had no duty to conduct some other kind of inspection. The defendant had the duty to determine whether other cables attached to the same utility pole had been damaged by the break in the Furtado cable. But this duty was created by the facts then reasonably available, *i.e.,* the breaking of a single service cable by a cluster of falling coconuts.

To determine whether the defendant failed to fulfill this duty, we must determine whether, under the facts available to him at the time, Mr. Ching acted reasonably in initiating his inspection at the plaintiff's meter box. Mr. Ching was sent to investigate a power failure at the Furtado house, not at the plaintiff's house. He arrived, found the broken and harmless cable, saw

the cluster of coconuts, and saw that the plaintiff's service line had not been broken. Even adding to this the fact that the ground was damp, we cannot agree with the plaintiff and the trial court that these danger signs were sufficient to warn Mr. Ching that the plaintiff's thin, broken, radio antenna wire was in contact with the electric wire the plaintiff had permitted to become exposed. In discharging his duty to determine whether current was flowing between the utility pole and the meter box, Mr. Ching proceeded to the most accessible device for measuring the flow, the plaintiff's meter box. This may have been only the first step in his inspection. He had been on the plaintiff's property only a brief moment. Within that short period of time, nothing more could reasonably have been expected.

## Duty to Warn

Mr. Ching's failure to warn the plaintiff of the imminent danger must be judged by the facts he knew or as a reasonable man should have known at the time, "The culpability of the actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward 'with the wisdom born of the event' ". Prosser, *Law of Torts*, § 31, at 149 (3d ed. 1964) ; *Ismert-Hincke Milling Co.* v. *Union Pac. Ry.*, 238 F.2d 14 (10th Cir. 1956) ; *Gerber* v. *McCall*, 175 Kan. 433, 264 P.2d 490 (1953) . It is undisputed that he lacked actual knowledge of the existence of the radio antenna wire or the bare spot. The plaintiff contends, however, that Mr. Ching should have seen the antenna wire or that he should have gone around the yard searching for loose wires before turning on the switch at the meter box. As indicated above, we have rejected the argument that he was under a duty at that time to inspect the plaintiff's electric lines or to search for miscellaneous wires which might have been knocked down.

When Mr. Ching requested permission to go onto the plaintiff's property he neither knew nor should have known of any facts which would require him to warn the plaintiff of danger. There was no evidence of any electric storm which had knocked down other transmission or service lines. The only line he knew was down was the Furtado's, and it had been broken by falling coco-

nuts. No other electric lines passed under the coconut tree and the plaintiff's service cable was not broken.

During oral argument on the original appeal, the plaintiff's counsel argued that Mr. Ching should have seen the radio antenna wire since it was "right in front of his nose" when he reached the meter box. At that point, counsel contended, he should have had sufficient basis acting as a reasonable man to warn the plaintiff. But the plaintiff, as well as Mr. Ching, failed to see the radio antenna wire. The wire was thin and the sky was overcast. The wire was hanging over the eaves, extending several feet beyond the wall of the house where the meter box was located. In proceeding directly to the meter box, Mr. Ching did not pass the wire.

On the other hand, the plaintiff was standing behind Mr. Ching, out from under the eaves and looking back toward the house. If the wire was in front of anyone's nose, it was the plaintiff's. If anyone should have seen the wire, it was the plaintiff, who at least knew that such a wire existed. Moreover, only minutes before, she had been in the same area by herself when she turned off the switch at the meter box. Furthermore, the plaintiff testified that she looked around to make sure she was not standing near any wires. Obviously no warning of potential danger would have made her act any differently.

### Duty to Turn Off the Power at the Pole

The trial court found that in exercising due care, Mr. Ching should have proceeded directly to the utility pole and turned off the electricity. An overwhelming number of cases hold, and we think properly, that a power company cannot be charged with negligence for failing to turn off the electric current in its line unless it had actual knowledge of the existence of danger, *Hoffman* v. *Leavenworth Light, Heat & Power Co.*, 91 Kan. 450, 461-62, 138 P. 632, 636 (1914); *Reichholdt* v. *Union Elec. Co.*, 329 S.W.2d 634, 637-38 (Mo. 1959), or at least had a reasonable basis on which to anticipate it, *cf.*, *Anderson* v. *Northern States Power Co.*, 236 Minn. 196, 201-03, 208, 52 N.W. 2d 434, 438-39, 442 (1952); *Mirnek* v. *West Penn Power Co.*, 279 Pa. 188, 191,

123 A. 769, 770 (1924). As we have indicated, there was neither actual nor constructive knowledge of either the plaintiff's defective electric wire or the plaintiff's broken radio antenna wire. There was no basis on which Mr. Ching could have concluded there was any danger which would have been eliminated by turning off the current at the pole. A preferable course of action may become apparent based upon what actually transpired. But this hindsight is not the test to be applied in determining whether Mr. Ching acted reasonably.

The findings of the trial court are clearly erroneous.

Reversed and remanded for entry of judgment for the defendant.

*Richard E. Stifel* (*Anderson, Wrenn & Jenks* of counsel) for defendant-appellant, cross-appellee.

*John E. Parks* and *Hyman M. Greenstein* for plaintiff-appellee, cross-appellant.

### DISSENTING OPINION OF MIZUHA, J.

The facts and circumstances of this case definitely indicate: (1) That defendant's employee was negligent in failing to make a proper inspection of plaintiff's electric service cable between the pole and meter box, and (2) That we cannot divide the areas of responsibility for the electric cable between the utility's pole and plaintiff's meter box.

When Mr. Ching, the foreman of a line crew of defendant, came upon plaintiff's premises to determine a fact which could have been ascertained from the pole outside of plaintiff's premises, he had the duty to inspect the entire length of the electric service cable between the pole and the meter box. Plaintiff would not have been placed in the position of being shocked by a live wire if defendant's employee, Mr. Ching, had not come upon plaintiff's premises to do something that was not to plaintiff's benefit. Mr. Ching chose to determine from the location of plaintiff's meter box whether there was electricity flowing along the utility's main line to the electric pole from which electric service cables led to Furtado's and plaintiff's residence. By inviting himself on the premises to do something for the benefit of the utility company,

Mr. Ching's course of action resulted in injury to plaintiff.

Mr. Ching's inspection of the electric service cable from pole to plaintiff's meter box was not reasonable under the facts of this case. In fact, he made no inspection. Mr. Ching testified:

"Q   When you were in Mrs. Furtado's yard, could you see the Naki service cable?

"A   Yes, I saw it.

"Q   How was that?

"A   That was still up.

"Q   Then you said you went through the gate into Mrs. Naki's yard?

"A   That's right."

All Mr. Ching saw was that the service cable "was still up." There is no testimony to the effect that he conducted any sort of inspection. It is difficult to comprehend the argument of the court when it states that "[w]hen Mr. Ching requested permission to go onto the plaintiff's property he neither knew nor should have known of any facts which would require him to warn the plaintiff of danger." Mr. Ching testified that the electric cables leading to the Furtado and plaintiff's residences originated from the same utility pole back of the plaintiff's residence, and that the Furtado cable was down on the ground on the back corner of plaintiff's lot, caused by a big cluster of falling coconuts "maybe a dozen or so, more or less—* * * ." The uncontroverted evidence shows that the antenna wire was hanging from the service cable and was energized because it was in contact with a bare spot on the cable.

This court has now established for housewives a standard of knowledge, skills and understanding of electric cables and electric power and their dangerous characteristics similar to that of a foreman of a line crew of an electric public utility. How times have changed. Even if the housewife had seen the antenna wire on the electric service cable, she would not have known that it was dangerous, because she did not have the same kind of training as an electric utility's lineman, and would have no idea of the possibility that it might be energized by contact to a live spot on the service cable. A natural reaction for a housewife whenever

she saw another wire dangling from the electric cable would be to pull it down without any concern about it being energized by contact to a bare spot on the electric cable.

When Mr. Ching elected to test whether there was electric energy in the main power line by going to the meter box of plaintiff's premises, he automatically assumed the duty of checking that portion of the service cable from the pole to the meter box. Any routine inspection of the service cable by an experienced lineman would have revealed the antenna wire in contact with a bare spot which was located only a few feet from the meter box. If Mr. Ching were not negligent in inspecting the service cable, and had seen the antenna wire, he would have warned plaintiff of the possible dangers from said antenna wire and would have then tested the flow of electricity at the pole.

No hindsight test need be applied in this case. The question is one of proper procedure by a lineman of electric public utility. This court now establishes the rule that when a lineman of an electric public utility answers a call concerning a broken service cable caused by falling coconuts from a consumer and there is a live wire still left on the consumer's pole as in this case, and then elects to go to a neighbor's home to check whether there is electric power in the utility's main service line, it is unnecessary for the lineman to inspect the neighbor's service cable from the pole to the meter box, even though there is a distinct possibility that the falling coconuts may also have damaged the service cable or other loose wires.

The foreman of the line crew of the public utility has no duty to warn a housewife because this court assumes as a matter of law that the standard of knowledge, skills and understanding of electric cables and electric power when falling coconuts have severed a neighbor's service cable and left a live wire on the service pole, is the same for housewives and electric utility linemen who service and repair downed electric cables and wires.

If a housewife, who, at the request of the utility lineman, is at the scene of the testing operation and is injured from a live energized wire as in this case, she is without a cause of action because the antenna wire which caused the injury was energized from a bare spot on the service cable about two or three feet

from the eaves of the house, that portion of the cable being the property of the consumer.

Heaven help housewives who are consumers of electric power in the State of Hawaii. They must now possess the same skills and knowledge of electric lines and electric power as the trained trouble-shooters of an electric public utility.